J-S37015-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ANTHONY WASHINGTON | |
| Appellant | No. 969 EDA 2014 |

Appeal from the Judgment of Sentence March 13, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0011611-2011

BEFORE:  GANTMAN, P.J., SHOGAN, J., and LAZARUS, J.

MEMORANDUM BY GANTMAN, P.J.:                **FILED JULY 21, 2015**

Appellant, Anthony Washington, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas, following his jury trial convictions for first-degree murder, criminal conspiracy, and possessing instruments of crime ("PIC").[1]  We affirm.

In its opinion, the trial court fully and correctly sets forth the relevant facts and procedural history of this case.[2]  Therefore, we have no reason to restate them.

---

[1] 18 Pa.C.S.A. §§ 2502(a), 903(c), and 907(a), respectively.

[2] On September 5, 2014, the court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On October 2, 2014, Appellant untimely filed a Rule 1925(b) statement, but requested the court to consider the statement as timely.  The court
*(Footnote Continued Next Page)*

Appellant raises the following issues for our review:

IS [APPELLANT] ENTITLED TO AN ARREST OF JUDGMENT ON ALL CHARGES, INCLUDING MURDER IN THE FIRST DEGREE, CRIMINAL CONSPIRACY AND PIC, WHERE THERE IS INSUFFICIENT EVIDENCE TO SUSTAIN THE VERDICT?

IS [APPELLANT] ENTITLED TO A NEW TRIAL ON ALL CHARGES WHERE THE VERDICT IS AGAINST THE GREATER WEIGHT OF THE EVIDENCE?

(Appellant's Brief at 3).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Steven R. Geroff, we conclude Appellant's sufficiency of the evidence claim merits no relief.[3]  The trial court opinion comprehensively discusses and properly disposes of the question presented.  (**See** Trial Court Opinion, filed December 19, 2014, at 60-61) (finding: Victim's cause of death was ruled homicide; during altercation at bar between Appellant and others several days earlier, Victim's friend shot at Appellant; evidence demonstrated Appellant planned to kill Victim; on date of murder, Appellant learned of Victim's location, arrived at location armed with .40 caliber Beretta, recruited

_(Footnote Continued)_ ─────────────

subsequently entered an order on October 7, 2014, which accepted Appellant's Rule 1925(b) statement as timely filed.

[3] In his first issue, Appellant fails to provide any argument regarding the sufficiency of the evidence for his convictions of conspiracy and PIC. Therefore, these claims are waived.  **See** Pa.R.A.P. 2119(a); **Coulter v. Ramsden**, 94 A.3d 1080, 1088 (Pa.Super. 2014) (stating: "Appellate arguments which fail to adhere to these rules may be considered waived, and arguments which are not appropriately developed are waived").

lookouts and getaway driver, and waited in alleyway for Victim to come out of local club and get into car; Appellant walked up to Victim's car and fired gun at Victim's vital body parts (head and chest); expert testimony established that any of fired shots would have killed Victim; Appellant sold gun following murder to "boy in South Philly," and ballistics evidence linked gun recovered from trunk of buyer's car to fired cartridge casings and bullets; Appellant told multiple people about murdering Victim and bragged about it; killing was willful, deliberate and premeditated; evidence was sufficient to sustain murder conviction).  The record supports Appellant's convictions.  Accordingly, we affirm Appellant's sufficiency issue on the basis of the trial court's opinion.

In his second issue, Appellant challenges the weight of the evidence. "[A] challenge to the weight of the evidence must be raised with the trial judge or it will be waived." *Commonwealth v. Gillard*, 850 A.2d 1273, 1277 (Pa.Super. 2004), *appeal denied*, 581 Pa. 672, 863 A.2d 1143 (2004) (internal quotation marks omitted).  A claim challenging the weight of the evidence generally cannot be raised for the first time in a Rule 1925(b) statement.  *Commonwealth v. Burkett*, 830 A.2d 1034 (Pa.Super. 2003). An appellant's failure to avail himself of any of the prescribed methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the trial court responds to the claim in its Rule 1925(a) opinion.  *Id.*  Instantly, Appellant failed to raise a timely claim

regarding weight of the evidence. Rather, Appellant raised the claim for the first time in his Rule 1925(b) statement. Therefore, Appellant's weight of the evidence claim is waived. ***See id.***

Moreover, even if properly preserved, Appellant's weight of the evidence claim would merit no relief. The court concluded:

> [T]he jury may regard evidence relating to the contents of any prior inconsistent statement as proof of the truth of anything each of these witnesses said in any earlier statement, as well as consider this evidence to help the jury assess the credibility and weight of the testimony of each of these witnesses at trial. Although multiple witnesses in the present case did not remember their earlier statements against [Appellant] and made various excuses for their memory lapses (for example, using opiates for years (Rice); being shot in the face twice (Childs); engaging in excessive drinking and fighting with his wife (Cropper)), all of those witnesses made prior statements to police. Those statements were damaging to [Appellant], and the jury was free to believe them.
>
> \*   \*   \*
>
> In the present case, witnesses Darian Brown (Blizz), William Childs (O), and James Newsome (Hawk) had criminal involvement in the death of [Victim] Omar Williams, and as such, they were accomplices in the crime. Although accomplice testimony was supported by copious independent evidence in the present case, even in the absence of such evidence the jury could still have found [Appellant] guilty solely on the basis of accomplice testimony if the jury was satisfied beyond a reasonable doubt that the accomplice had testified truthfully and that [Appellant] was guilty.
>
> Here, the evidence presented at trial viewed in the light most favorable to the Commonwealth as verdict winner established that [Appellant] has committed the crime of murder of the first degree. The malice could have been inferred, *inter alia*, from [Appellant's] use of a deadly

weapon on vital parts of [Victim's] body—his head and chest. The evidence also demonstrated that [Appellant] engaged in extensive planning for [Victim's] murder and employed other people to act. This court has noted that "this could have almost been like an organized crime case" complete with lookouts and a getaway driver. [Appellant] then took a substantial step in furtherance of the conspiracy by firing shots at [Victim] thereby murdering him. In addition, the evidence demonstrated that [Appellant] was in possession of an instrument of crime and that he intended to employ it criminally.

Upon review of the challenge to the weight of the evidence, this court concludes that the verdict was consistent with the evidence. The jury was free to believe all, part or none of the evidence, and it clearly found the evidence to be credible and reliable.

We conclude, therefore, that the jury verdict did not shock any sense of justice. No relief is due.

(Trial Court Opinion at 65-67) (citation to record omitted). Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/21/2015

- 5 -

**IN THE COURT OF COMMON PLEAS**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CRIMINAL SECTION**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | **CP- 51-CR-0011611-2011** |
| | : | |
| **vs.** | : | |
| | : | |
| **ANTHONY WASHINGTON** | : | **SUPERIOR COURT NO. 969 EDA 2014** |
| | : | |

CP-51-CR-0011611-2011 Comm. v. Washington, Anthony
Opinion



7236940051

**OPINION**

**FILED**

DEC 19 2014

Criminal Appeals Unit
First Judicial District of PA

**GEROFF, J.**

**DECEMBER 19, 2014**

On March 13, after a jury trial, the Defendant, Anthony Washington (nicknamed "Ant," "Peanut"), was convicted of murder of the first degree, conspiracy to commit first-degree murder, and possessing an instrument of crime. (N.T. Volume 1, 03/13/2014, pp. 128-29). Also on March 13, 2014, this court sentenced the Defendant to a mandatory term of life imprisonment without possibility of parole for the offense of murder of the first degree, and a consecutive term of ten (10) to twenty (20) years on the charge of conspiracy to commit first-degree murder. No further penalty was imposed on the charge of possessing an instrument of crime. (N.T. Volume 1, 03/13/2014, pp. 135-36).

On or about March 21, 2014, the Defendant filed a timely Notice of Appeal through Joseph C. Santaguida, Esquire, who represented the Defendant at trial. Following the filing of Notice of Appeal on the Defendant's behalf, Attorney Santaguida filed a Motion to Withdraw Appearance of Counsel and to Order the Lower Court to Appoint Appellate Counsel which was granted by the Superior Court on May 5, 2014. On May 14, 2014, the Court of Common Pleas of Philadelphia County appointed David Scott Rudenstein, Esquire, to represent the Defendant *in forma pauperis.*

On September 5, 2014, this court ordered counsel for the Defendant to file a concise Statement of Matters Complained of on Appeal pursuant to PA. R.A.P. §1925(b). On October 2, 2014, counsel for the Defendant filed a concise Statement of Matters Complained of on Appeal, indicating that the necessary notes of testimony were unavailable at the time of his appointment. Counsel for the Defendant requested permission to file a supplemental statement by October 9, 2014, once counsel fully read the six (6) volumes of transcript of the trial record to determine what issues had been preserved for appeal. To avoid the possibility of waiver of otherwise previously preserved issues on appellate review, Attorney Rudenstein requested that this court issue an Order that would accept the 1925(b) Statement of Matters Complained of on Appeal, filed on October 2, 2014, as timely filed. On October 3, 2014, this court ordered that the Defendant's request be granted and that the 1925(b) Statement of Matters, or Supplemental Statement of Matters, if filed on or before October 9, 2014, be deemed timely filed.

In his Statement of Matters Complained of on Appeal, the Defendant argues that he is entitled to an arrest of judgment because the evidence was insufficient to support the verdict which found the Defendant guilty of first-degree murder, possessing an instrument of crime (PIC), and conspiracy to commit murder.

2

The Defendant also argues that he should be awarded a new trial because the verdict is not supported by the greater weight of the evidence. Relying on *Commonwealth v. Karkaria*, 533 Pa. 412, 625 A.2d 1167 (1993),[1] the Defendant claims that the greater weight of the evidence did not establish that the Defendant was a principal, a conspirator, or an accomplice with regard to any of the crimes charged.

## THE EVIDENCE

The evidence adduced at trial established that on November 29, 2009, shortly after 5:00 o'clock in the morning, the Defendant shot and killed Omar Williams in the 6100 block of Market Street in Philadelphia after the victim entered his parked vehicle. The killing was preceded by an incident at the Copabanana Bar a few days before, involving a verbal altercation between the Defendant and the victim followed by the victim's friend firing shots at the Defendant and his people. The Defendant recruited his cousins, Darian Brown (nicknamed "Blizz") and James Newsome (nicknamed "Hawk"), as his lookouts for the planned murder. He also used his neighborhood friend, William Childs (nicknamed "O"), as his getaway driver.

### *The Murder*

Police Officer Anthony Washington (no relation) testified that on Sunday, November 29, 2009, he was working a "last-out tour" - from 12:00 am to 8:00 am - with his partner, Police Officer Stark (first name not stated). They were in a marked patrol vehicle, and Officer Washington was the driver. Officer Washington testified that shortly after 5:00 am he received a

---

[1] Defendant's reliance on *Commonwealth v. Karkaria*) is misplaced. In *Karkaria*, the court held that evidence was not sufficient to support defendant's conviction for forcible rape; the victim's testimony as to when any particular act of rape occurred was vague and contradictory; initially, she testified that assaults occurred only on Friday or Saturday evenings, and thereafter testified that assaults occurred at another time; moreover, she insisted that the assaults occurred only when defendant was babysitting, and yet she also admitted that during the time period charged in the indictment, defendant no longer acted as babysitter.

3

radio assignment alerting him of a person with a gun and a report of a shooting at 61st and Market Streets. (N.T. Volume 1, 03/05/2014, pp. 57-59).

Officer Washington and his partner immediately proceeded to that location, with lights and sirens activated. Upon their arrival moments later, Officer Washington observed a silver Honda Accord on the corner facing the Ron and Jess Place bar. The car appeared to have been involved in an accident. (N.T. Volume 1, 03/05/2014, pp. 60-61).

Officer Washington exited his patrol car and went to the driver's door side. He could hear the engine "revving real, real loud from the car." The car had tinted windows. When Officer Washington opened the door, he saw a male inside. Based on his experience, Officer Washington determined that the man was shot in the head. He also observed a gunshot wound to the right side of the victim's cheekbone, next to his ear. There was blood coming from the right side of his head. There was also blood and brain matter on the driver's side of the window. Officer Washington had to remove the victim's feet from the gas pedal. The victim was unresponsive; he had no pulse. Officer Washington testified that based on his experience with gunshot victims, the male was not alive. (N.T. Volume 1, 03/05/2014, pp. 61-62).

The victim was pronounced dead after the paramedics and the Philadelphia Fire Department came to the scene. Officer Washington testified that he believed that he was still at the scene when someone from the Medical Examiner's Office came out as well. There was extensive damage to the victim's vehicle. There was also a hole in the wall of the Ron and Jess Place Bar, where the car had impacted. The car bounced off the wall and was stuck on the curb on the South side of Market Street. (N.T. Volume 1, 03/05/2014, pp. 63-64).

Police secured the entire area - from 60th and Market Streets to 61st and Market Streets – as a crime scene and roped it off with yellow tape. Officer Washington and other officers then

4

searched the entire block for fired cartridge casings, and they located some on the north side of Market Street. (N.T. Volume 1, 03/05/2014, p. 64).

Officer Washington confirmed at trial that the photographs of the decedent's vehicle accurately depicted the damage to the passenger's side of the vehicle. The photographs showed two bullet holes to the rear of the victim's car, and one bullet hole to its front. No projectiles were recovered from the car. (N.T. Volume 1, 03/05/2014, pp. 73-74).

Officer Washington remained at the crime scene until daybreak. He then went down to the Homicide Unit, where he was interviewed at 7:15 in the morning. (N.T. Volume 1, 03/05/2014, pp. 75-76).[2]

Antoine Rice testified that he was 27 years old and that he grew up in West Philadelphia. He stated that the Defendant was his childhood friend. Rice confirmed that he was also friendly with the Defendant back in 2009, and that they would sometime go out and drink and party. Rice would also hang out with the Defendant at the Defendant's house on a regular basis. He indicated that he knew neither James Newsome (Hawk), nor Darian Brown (Blizz), and that he never saw them at the Defendant's house. He also said that he did not know William Childs (O), and had never heard anyone ever mention O's name. (N.T. Volume 1, 03/05/2014, pp. 86-89).

Rice testified that he had been at the Copabanana Bar on a few occasions but that he had never been there with the Defendant. He also noted that he had not been at that bar in November 2009. Rice stated that he did not know the victim, Omar Williams, nicknamed "Cracks," and that he had never heard anyone say his name. He also said that while he had heard about an

---

[2] On cross-examination, Officer Washington stated that he did not recall mentioning to homicide detectives that a black female was standing next to the car door when he arrived on the scene. While he did not deny talking to the female, he said, "I just don't remember five years later." Officer Washington explained that the focus of his attention was the victim, not the other people who might have been on location. (N.T. Volume 1, 03/05/2014, pp. 79, 84).

5

after-hours club, the Wheels of Soul, he had never been there personally and did not even know the club's location. (N.T. Volume 1, 03/05/2014, pp. 89, 93-94).

Rice stated that he was unaware of any problem whatsoever between the Defendant and Cracks. He also said that he had no idea that in the early morning hours of November 29, 2009, someone had been shot to death at 61st and Market Streets. (N.T. Volume 1, 03/05/2014, pp. 95-96).

Rice noted that he had never talked to the Defendant or his cousins, Brown (Blizz) and Newsome (Hawk) about what had happened on November 29, 2009. He also did not recall ever talking to the investigators about it. (N.T. Volume 1, 03/05/2014, p. 97).

When asked if anything happened between March 2010 and the trial that would have affected his ability to recall matters or events, Rice answered in the affirmative. He explained that he was addicted to opiates and stated that he had been in an outpatient rehab for six months to treat his addiction. Although Rice confirmed that his addiction had not affected his ability to remember where he worked, his business hours and office location, he testified that he had no recollection of giving an interview to detectives in March of 2010. (N.T. Volume 1, 03/05/2014, pp. 98-101).

When shown the statement which he had given to Detective Mullen (first name not stated) at Southwest Detectives on March 17, at 4:22 am, Rice confirmed that he recognized his signature. However, he stated that he did not recall being interviewed at Southwest Detectives in the early morning hours of March 17, 2010. (N.T. Volume 1, 03/05/2014, pp. 103-105).

Rice testified that he did not remember anything unusual happening on March 16, 2010. He did not remember that on that day, as he was sitting on the steps of a house on the 5700 block of Addison, someone jumped out of a vehicle and fired shots at him. He also did not recall

6

having a firearm on him that day or firing back at someone. He said that he was not licensed to carry a gun. He did not recall going down to Southwest Detectives and giving a statement or being transported to the Homicide Unit at 8th and Race Streets afterwards. (N.T. Volume 1, 03/05/2014, pp. 106-108).

When shown a statement which he had given at Homicide, Rice confirmed that his name was indeed written at the top of the statement, and that his biographical information was accurate. He also confirmed that the statement contained the date, March 17, and the time, 11:00 am, and that it said, "We are questioning you concerning the shooting death of Omar Williams on November 29, 2009." However, he reconfirmed that he had no recollection of being at the Homicide Unit and denied giving a statement there. (N.T. Volume 1, 03/05/2014, p. 108).

On direct examination, Rice either denied that he provided specific answers to the investigators' questions on March 17, 2010 or stated that he did not remember those questions. Rice also stated that he did not remember any of the investigators. He also testified that he did not remember telling the investigators that he had information regarding the murder of Omar Williams on November 29, 2009 on the 6100 block of Market Street and that he knew who had committed it. He did not recall saying that he was not present when the murder occurred. (N.T. Volume 1, 03/05/2014, pp. 109-112). He also did not recall saying to the investigators:

> This all started when we was down at a bar called Copa's. It's at 40th and Spruce Streets.[3] We was in the bar. It was me, Ant, and O. We was in the bar and Ant and Crack [sic], the guy who got killed, got into an argument. When Ant and Crack was arguing, one of Crack's friends who they call Nah pulled out a gun and starting shooting at Ant.

(N.T. Volume 1, 03/05/2014, p. 112).

Rice did not remember saying, "Ant didn't get hit but one of the bouncers in the bar got shot. We all left the bar and that's why Crack got killed a couple of days later." Furthermore, he

---

[3] Witness William Childs (O) stated that the Copabanana Bar is located at 40th and Sansom Streets. (N.T. Volume 3, 03/07/2014, p. 47).

did not remember saying in his statement, "Ant told me that he did it." (N.T. Volume 1, 03/05/2014, p. 113).

Rice stated that he did not remember being asked what the Defendant told him about the incident, and that he did not recall saying to the investigators that the day after the shooting, the Defendant called him on the phone and said, "Yo, watch the news." Rice also did not remember stating that he turned on the news and saw Cracks' white Honda; he did not recall learning from the news that "the guy got killed." He had no memory of calling the Defendant afterwards and asking him if he had done it. Rice also had no recollection of meeting the Defendant the morning after the shooting and talking to him about the incident. (N.T. Volume 1, 03/05/2014, pp. 115-16).

Rice confirmed that in the past they indeed used to hang out at the corner of 57th and Addison Streets. However, he said he did not remember saying:

> I went outside and Ant was on the corner. I went and talked to him, and he told me everything that went down. Ant said that him, O, Blizz, and Hawk was all part of it and said that they set up on Crack's car because they found out where he was at. Ant said that Blizz and Hawk was the lookouts and that O was the driver. Ant told me that he shot Crack.

(N.T. Volume 1, 03/05/2014, p. 117).

When asked if he could have very well said all of that but just did not recall because of his addiction, Rice answered in the affirmative. (N.T. Volume 1, 03/05/2014, p. 118).

Rice noted that he did not remember telling the investigators:

> Ant said that he was set up near an alleyway and when Crack came by Ant shot him and then ran down the alleyway to where the car was at. I asked Ant how they knew where Crack was at, and Ant told me that he got a phone call from somebody and they told Ant that Crack was at the Wheels of Soul club on Market Street. So they went up there and just waited for him to come out.

(N.T. Volume 1, 03/05/2014, p. 120).

8

Rice stated he did not remember being asked if he had known what kind of gun the Defendant used to shoot the decedent. He also did not recall saying, "Ant told me that it was a .40-caliber. Ant sold it to some boy in South Philly after he shot Crack." (N.T. Volume 1, 03/05/2014, pp. 120-21).

Rice also did not remember saying that Ant's car, a Delta '88, a green car with tinted windows, was used as a getaway car but that O was the driver. Rice noted that although he and the Defendant lived right around the corner from one another, he did not know what kind of car the Defendant was driving and that he had never seen the Defendant in a vehicle. (N.T. Volume 1, 03/05/2014, pp. 121-22).

Rice denied saying to the detectives that O is William Childs and that he had known him for about five years. He also stated that he did not recognize his signature on the statement. He denied saying that Blizz's real name was Darian Brown and that he had known him for about four or five years. He stated that he did not remember saying that he had met Blizz and Hawk at the same time, that they were "Ant's cousins," and that he met them through the Defendant. Rice confirmed that he still considered himself a close friend of the Defendant. (N.T. Volume 1, 03/05/2014, pp. 123-26).

When shown the photograph of the Defendant with "Ant " written on top of it, Rice said that he did not recognize the penmanship and that he also did not remember if the signature was indeed his. However, when asked if that could be his signature, he answered in the affirmative. (N.T. Volume 1, 03/05/2014, pp. 128-29).

Rice stated that he had no recollection of being shown a video of certain people standing on a street corner, contrary to the statement he gave to the investigators:

> "Question: You were shown a video of two males who were standing on the corner outside of a store; is that correct?

9

"Answer: Yes.
"Question: Were you able to identify the two males that you saw on the video?
"Answer: Yeah. It was Hawk and Blizz, Ant's cousins. Blizz has a cast on his hand. He told me that he broke his hand fighting with someone. Hawk is the one talking on the cell phone in the video."
Sir, do you remember that?
A. No, sir.
Q. And when you say you don't remember, this could have been your answer; you just don't remember, correct?
A. Yes, sir.

(N.T. Volume 1, 03/05/2014, p. 131).

Rice also noted that he did not remember stating that he showed Detective Peterman Blizz's and Hawk's photographs from his Facebook page. In fact, he denied even having a Facebook page. He recognized his own photo but said that he did not recognize the person standing off to his left in the photo, Darian Brown. He also said that he typically poses in photographs with people he does not know and that he probably was high on drugs when the photograph was taken. The penmanship on top of the photographs did not look familiar to him as well.[4] (N.T. Volume 1, 03/05/2014, pp. 131-36).

Rice did not remember ever talking to any of the Defendant's cousins about what had happened to the victim. He did not remember stating: "I talked to Blizz and Hawk. They both just said that they was there. They said that they 'fell back' when the shooting happened. O never talked to me about it." (N.T. Volume 1, 03/05/2014, p. 137).

He stated he had no recollection of reading the statement to make sure that everything in it was true and correct, and signing his name on each of the four pages of the statement. He also denied identifying and signing the photographs. He indicated that he did not recognize the penmanship on the signature and the date. (N.T. Volume 1, 03/05/2014, p. 138).

---

[4] Although Rice stated that he did not have a Facebook account, District Attorney reminded him that Rice gave his account number AntoineRice@Gmail.com and password TRAP57 to Detective Mullen from Homicide. Rice said that he, in fact, had never heard that password before. (N.T. Volume 1, 03/05/2014, pp. 147-48).

10

Rice also stated that he did not remember detectives ever showing him a Statement of Adoption Attestation. Rice, in fact, stated that he did not recognize that document and the signature on it. He also did not remember Detective Bamberski (first name not stated) signing it. (N.T. Volume 1, 03/05/2014, pp. 139-42).

In addition, Rice had no memory of any incident at the bar in West Philadelphia where shots were fired shortly before the incident. (N.T. Volume 1, 03/05/2014, p. 142-43).

The Commonwealth then directed him to look at the statement he had given at Southwest Detectives on March 17, at 5:22 am (prior to giving his statement at Homicide):

> "Question: What time did you arrive on the 5600 block of Addison Street on 3/16/10?
> "Answer: I'd say about 4:30 or 5:00 p.m.
> "Question: What were you doing around there? What was your purpose for being there?
> "Answer: "Basically I was going to see Donna. ..... We were sitting outside talking. Then a white Mercury came up Addison Street.... One of the gentlemen hopped out of the back passenger seat. This guy had a gun out already. He started firing at me. I started firing back at him. As the guy was firing, my friend, William Childs, ran his daughter into Donna's house. As I finished firing, I ran into the house to make sure the baby was okay. Then I ran through the alleyway that exits out on to my block, 5600 Osage. I ran into my house. I was telling my grandmother what happened. I went back outside. I went through the alleyway, and there were two cops standing there in the alleyway. I let them know I was the shooter. The cops took my gun, and they took my permit out of my wallet, then they brought me here."

(N.T. Volume 1, 03/05/2014, p. 146).

Rice stated that he did not remember being shot at on March 16, or pulling a gun and shooting at anyone. He agreed, however, that if someone shot at him that would be a startling event, and that if he had to pull out his gun and fire, that would be "a pretty big deal." (N.T. Volume 1, 03/05/2014, p. 146).

Police Officer Brian Stark, a member of the Crime Scene Unit, testified that he was on duty on Sunday, November 29, 2009, in the early morning hours. He worked midnight to 8:15 am that day, with William Whitehouse, a Crime Scene Investigator (CSI). On November 29,

11

2009, at 5:25 am, Detective Centeno (first name not stated) of the Homicide Unit notified them of the incident at 6000 Market Street. (N.T. Volume 2, 3/6/2014, pp. 7-9).

Officer Stark stated that they arrived on location at 6:15 am. It was cold and dry. Upon checking in with the officer who was in control of the crime scene and meeting with Detective Gall (first name not stated) and Detective Harkins (first name not stated) from the Homicide Unit who were out at that scene, Officer Stark conducted a survey of the scene.[5] He testified that when they did the walk-through, they identified multiple fired cartridge casings on the highway in front of 6039 Market Street. There was a gray Honda Accord on the south side of Market Street in front of 6054 Market, and it had front-end damage consistent with damage to the façade of the property at 6054 Market: there was a hole in the property wall and debris below the hole. A black male driver was in the driver's seat of the vehicle. The vehicle had dark-tinted windows and it had three bullet holes in the front and back windows on the passenger side. There was also a projectile embedded in the door frame between the front and rear doors on the passenger side. (N.T. Volume 2, 3/6/2014, pp. 9-12, 26, 41-42).

Officer Stark stated that the scene was secured when they arrived, with no pedestrian or vehicle traffic permitted. Officer Stark noted that there were five casings at the scene and that they all were collected. The collected evidence was documented, packaged, placed on Property

---

[5] Officer Stark stated that his training started in 1995 through the Crime Scene Unit. He was trained as a patrol officer in collecting fingerprints from crime scene, and in 2000, he was transferred to the Crime Scene Unit. Officer Stark noted that his job involves an ongoing training process and that whenever "the technology of techniques or new methods arise, [they are] trained in those updates." He stated that over the past 14 years, he had been trained in forensic photography and had been certified in many aspects of fingerprint collection and identification, blood splatter analysis and reconstruction, videography, note-taking and drawing diagrams. (N.T. Volume 2, 3/6/2014, pp. 6-7).

12

Receipt No. 9010313, and then submitted to the Firearms Identification Unit for further testing. (N.T. Volume 2, 3/6/2014, pp. 12, 14, 18, 30-33).[6]

The decedent's vehicle was later towed from that area and taken to the police garage, to be searched for any other ballistic evidence. The vehicle was processed on November 30th at 12:40 p.m., the day after Officer Stark was at the crime scene. Officer Stark confirmed that he reviewed a supplemental service report in reference to the original crime scene prepared from the police garage processing of the decedent's Honda Accord by Police Officer Gain (first name not stated) and CSI Leo Rayhill. The copper projectile embedded in the vehicle's door frame was extracted, placed on Property Receipt No. 9010320, and submitted to the Firearms Identification Unit for microscopic examination. (N.T. Volume 2, 3/6/2014, pp. 35-37, 41-42).

Officer Stark confirmed that the photographs taken on the scene, presented in conjunction with one another, accurately depicted the north side of the street and various lots that existed when he was out there that morning. He indicated that there did not appear to be any fencing to prevent someone from walking in or out of those areas. (N.T. Volume 2, 3/6/2014, pp. 24-25).

Darian Brown (Blizz) testified that he is the Defendant's cousin. Brown stated that on Saturday, November 28th, going into the early morning hours of Sunday, November 29, 2009, he was at the location of 61st and Market Streets when the victim was shot to death. (N.T. Volume 2, 3/6/2014, p. 46).

---

[6] Officer Stark explained that the crime scene - the area of 6000 Market - was initially measured and documented with a rough sketch. Later on, after all the measurements were taken and a formal diagram drawn to scale, the final sketch was prepared. The sketch showed Millick Street to the right of the diagram, and 61st street to the left of the diagram, with the arrows indicating the direction of travel of the lanes of Market Street. The sketch also showed vehicles No. 1 and No. 2, with No. 1 being the victim's Honda Accord, and No. 2 being the Chevy Beretta it struck. The blue dots on the sketch indicated the location of the five fired cartridge cases, which were in the street just south of the north sidewalk. (N.T. Volume 2, 3/6/2014, pp. 33-34).

13

Brown said that earlier that morning he had been at his apartment in Darby with James Newsome, his cousin. Brown also testified that Newsome is also the Defendant's cousin. (N.T. Volume 2, 3/6/2014, pp. 46-48).

Brown said that he knew William Childs (O) through the Defendant. Brown also noted that he knew Antoine Rice, and that both he and Rice grew up around his grandmother's neighborhood. He stated that Rice knew O and Newsome, and that they all had been hanging out at 57th and Addison together at various times. (N.T. Volume 2, 3/6/2014, p. 49).

Brown indicated that when they were at the apartment in Darby, his cousin Newsome received a phone call from the Defendant. He also stated that he did not hear any of that telephone conversation, and that Newsome relayed to Brown its content afterwards. (N.T. Volume 2, 3/6/2014, pp. 48, 50).

Newsome told him that the Defendant wanted both of them and Childs to meet at 60th and Market Street at the after-hours club, Wheels of Soul. Newsome explained to Brown that the Defendant wanted him and Brown down there to serve as lookouts. Brown said that he did not know what problem, if any, the Defendant had had with Cracks. He acknowledged, however, that, according to Newsome, there was some kind of gang war between the Defendant and Cracks, and that the Defendant was planning to shoot Cracks. (N.T. Volume 2, 3/6/2014, pp. 51-54, 57).

After Newsome had updated Brown on the Defendant's intentions, they got in the car and drove down 60th Street to the Dewey Street block. Brown noted that the Defendant asked him and Newsome to come down because he trusted them as his family. Brown understood that their role would encompass being the lookouts and that in addition to looking for Cracks, they were also supposed to be looking out for the police. (N.T. Volume 2, 3/6/2014, pp. 51-54, 57).

14

They parked on Dewey Street, and the Defendant and Childs showed up in about 20 minutes. Eventually, Brown and Newsome set up on Millick Street, outside the Puerto Rican store, waiting for Cracks to come out of the after-hours club. They were stationed almost directly across the street from the bar and were able to see people leaving the club. Brown stated that the Defendant told him that Cracks drove a Honda Accord and also pinpointed for him the vehicle's location as it was parked on Market Street. (N.T. Volume 2, 3/6/2014, pp. 55-57).

While Brown and Newsome were stationed on Millick Street, Childs and the Defendant were positioned in the alleyway, which was "basically exactly in front of the victim's car." Brown testified that the Defendant told him that he had a gun with him, a Glock .40. (N.T. Volume 2, 3/6/2014, pp. 57-58).

Brown "paced back and forth" between Millick and Market Streets, waiting for the "final time, for the let out" – when they expected the victim to leave the club. Brown was positioned by the Puerto Rican store, which was about "two or three car lengths" from the victim's car. From his location, he was able to get back into the cutout area where the Defendant and Childs were stationed through an alleyway in the back of the store. Brown stated that he did not see the Defendant on the phone with anyone from the club. Later on, Brown and Newsome left the corner of Millick Street upon receiving a phone call from the Defendant, who instructed them to go back in the alleyway. (N.T. Volume 2, 3/6/2014, pp. 58-62).

Finally, Cracks came walking down the street with two other people. Brown could see the victim's Honda from where he was positioned. Brown noted that the victim was going toward his car, while the other two individuals who were with him were walking on toward the car parked on Millick Street. Once the victim got into his car, the Defendant came running out of the alleyway, got to the victim's car, let off "three to five shots," then ran back into the

15

alleyway where Brown, Newsome, and Childs were still positioned. (N.T. Volume 2, 3/6/2014, pp. 62-64).

Brown stated that he saw the Defendant fire the gun. When asked how the Defendant was pointing the handgun at the passenger's side of the victim's car, Brown demonstrated by using both of his hands. Brown also stated that after the shots were fired, the Honda ran into a parked car, then hit a wall. All four of them then ran off; Brown and Newsome ran back toward Dewey Street, got into Brown's car and drove off; the Defendant and Childs went a separate way. (N.T. Volume 2, 3/6/2014, pp. 64-65, 109-111).

Brown stated that neither he nor Newsome carried a gun that night. Brown was not sure if Childs had a gun. The only person whom he saw fire a gun that night was the Defendant. Brown showed that the Defendant was about seven or eight feet away from the car when he was firing the shots. (N.T. Volume 2, 3/6/2014, pp. 66-67).

Brown spoke with the Defendant later on that day at his grandmother's house in West Philadelphia. The Defendant told him that he and Newsome should "lay low, stay out of the way, and don't let it stress you or whatever because I did what I had to do so just hang in there." (N.T. Volume 2, 3/6/2014, p. 67).

Brown testified that while he was with Newsome the night after the shooting, Newsome received a phone call from the Defendant, who told him to turn on the news later that day. From the news, Brown learned that Cracks was dead. (N.T. Volume 2, 3/6/2014, pp. 68-69).

Brown stated that he and the Defendant would "talk here and there" about the incident, and that during those conversations, the Defendant would say something along the lines of "just don't let it bother you, it's going to be all right." Brown said that he was worried because he

16

knew that the night of the incident he was under surveillance cameras the whole time. He could see the cameras "right there." (N.T. Volume 2, 3/6/2014, pp. 69-70).

He testified that eventually there came a time when police officers and homicide detectives came and got him and brought him down to Homicide for questioning. One of the investigators was Detective Levi Morton. They explained his constitutional rights to him, and Brown then made a statement about what had happened. The first time he talked to them, he omitted his own involvement. He told the investigators, however, that he was a lookout. He also told them that his cousin, the Defendant, had a gun with him. (N.T. Volume 2, 3/6/2014, pp. 71-72).

Brown testified that, as a result of his statement and other evidence, Brown was charged with murder of the first degree and conspiracy. His case was listed for trial almost two weeks before the Defendant's trial before this court. Prior to going to trial, Brown talked with his attorney, Brian McMonagle, about the possibility of cooperating. Attorney McMonagle then reached out to the prosecutor, and it was agreed that Brown would testify at the Defendant's trial. About two weeks before the Defendant's trial, Brown pled guilty to the charge of murder of the third degree and conspiracy before this court. Brown understood that if he pled guilty and testified against the Defendant, he could get a reduced sentence. He confirmed that the sentence was to be set by this court. Brown said he understood that his obligation under the plea agreement would be to tell the truth. He confirmed that he indeed was telling the jury what he had seen that night. (N.T. Volume 2, 3/6/2014, pp. 73-75, 90-96, 98-100, 101-118).

Brown stated that between the time he arrived on Dewey Street, about an hour passed before he observed the Defendant shoot the victim. He recognized himself and Newsome on a video from about 3:57 am that morning: they were looking in the direction of Market Street

17

where the victim's Honda Accord was parked.[7] He confirmed that the video showed them walking down Market Street toward the Puerto Rican store, then at some point going back to the corner of Millick Street to look out for other people who might have been with the victim or for police. (N.T. Volume 2, 3/6/2014, pp. 76-83).

Brown also recognized himself and Hawk on another video clip from about 4:41am or 4:42 am that morning. He stated that they were looking in the direction of the Wheels of Soul, the after-hours club, while the Defendant and Childs were in the alleyway. Newsome was on the phone with the Defendant at that time. (The Defendant wanted them back in the alleyway.) On a photograph shown to him, Brown identified the victim's Honda as the vehicle into which the Defendant had fired. (N.T. Volume 2, 3/6/2014, pp. 83-86).

Brown recognized a copy of the statement that he had given to Homicide investigators back on November 30, 2010, when he was picked up for being involved in this incident and spoke with Detectives Morton and Holmes. He confirmed that the he recognized the questions of the detectives and his answers regarding the shooting death of Omar Williams. He stated that he was not truthful when he said that someone gave him and Hawk a ride to 60th and Market Streets. In fact, he was the one behind the wheel. He also stated that he was not truthful when he stated to the Detectives Morton and Holmes that he did not witness the shooting and that he did not know what car the victim was driving. Asked about what made him lie, Brown said that he was in a hurry to get out of Homicide and go home. (N.T. Volume 2, 3/6/2014, pp.90-94).

Brown noted that it was not easy for him to come to the courtroom and tell what he saw that morning and to identify the Defendant, his blood cousin, in front of family and friends. He stated that it was not a "walk in the park." (N.T. Volume 2, 3/6/2014, p. 121).

---

[7] Brown was wearing a sling because his arm was injured. (N.T. Volume 2, 3/6/2014, p. 81).

18

Detective Joseph Bamberski confirmed his involvement in the investigation. The assigned detective on the case was Detective Howard Peterman. (N.T. Volume 3, 03/07/2014, p. 7).

Detective Bamberski testified that he came in contact with Antoine Rice ("Twan") in connection with Omar Williams' death and that he took a statement from Rice. Detective Bamberski stated that he was aware that prior to giving a statement at Homicide, Rice had given a statement to Detective Mullen at Southwest Detectives about his involvement in an incident in Southwest Philadelphia. Rice told Detective Mullen that he had been shot at that morning and that he fired back in self-defense. Because some of the information he provided to Detective Mullen was relevant to the homicide which they were investigating, Rice was subsequently brought from Southwest Detectives to the Homicide Unit. Detective Bamberski confirmed that Rice gave his statement to Homicide on March 17, 2010. (N.T. Volume 3, 03/07/2014, p. 7-11, 34).

Detective Bamberski testified that Rice did not appear to be under the influence of either drugs or alcohol when he met him and that he did not seem to express any reservation or hesitation. Rice was not handcuffed during the interview. After having an informal conversation with him, Detective Bamberski memorialized in writing the information that Rice was providing to him about the shooting death of Omar Williams on 11/29/2009. Detective Kenneth Rossiter was also present when Rice was making his statement. Rice was formally interviewed in one of the cubicles at the Homicide Unit. (N.T. Volume 3, 03/07/2014, pp. 12-15).

In the interview, Rice stated that he had information regarding the murder of Omar Williams and that he knew who killed him, though he personally was not present on the scene. Rice stated that it all started when he, the Defendant (Ant), and Childs (O) were at a bar

19

"Copas," near 40s and Spruce Streets.[8] The Defendant and Williams got into an argument. As the Defendant and the victim were arguing, one of the victim's' friends, known as Little Nah, pulled out a gun and started shooting at the Defendant. The Defendant was not shot, but one of the bouncers in the bar was hit. After this incident, they all left the bar. A couple of days later, the victim was killed. (N.T. Volume 3, 03/07/2014, pp. 15-16).

Rice stated that the Defendant told him that he, in fact, had killed the decedent:

The day after the shooting at Copas I talked to Ant, and he told me he was mad as shit, and that he was going to get Crack for what happened. The day after that I was in my house and Ant called me and asked me to come out but I was chilling in my house and I didn't meet up with him. The next morning Ant called me on my phone and he was, like, 'Yo, watch the news.' I was watching the news and I saw the white Honda that Crack always drives and the news was saying that the guy got killed. I called Ant up and I asked him if that was him, did he do it. Ant said, 'I told you that I was going to get him.' ...I asked him who he was with and he asked me to come and meet him. I went outside and Ant was on the corner. I went and talked to him and he told me everything that went down. Ant said that him, O, Blizz, and Hawk was all part of it. Ant said that they set up on Crack's car because they found out where he was at. Ant said that Blizz and Hawk was the lookouts and that O was the driver. Ant told me that he shot Crack. Ant said that he was set up near an alleyway, and when Crack came by, Ant shot him and then ran down the alleyway to where the car was at. I asked Ant how they knew where Crack was at. Ant told me that he got a phone call from somebody, and they told Ant that Crack was at the Wheels of Soul Club on Market Street. So they went up there and just waited for him to come out.

(N.T. Volume 3, 03/07/2014, pp. 17-18).

Rice also stated that the Defendant told him that he used a .40 caliber gun, and that after the shooting, the Defendant sold it to "some boy in South Philly." Detective Bamberski noted that, to the best of his knowledge, the murder weapon had not been recovered. (N.T. Volume 3, 03/07/2014, p. 18).

---

[8] Witness William Childs (O) stated that the Copabanana Bar is located at 40th and Sansom Streets. (N.T. Volume 3, 03/07/2014, p. 47).

20

Detective Bamberski indicated that at the time of the interview they had no names. There was some video surveillance footage; however, at that time, the persons on the video had not been identified yet. (N.T. Volume 3, 03/07/2014, p. 19).

Rice also told them that the Defendant was driving a green Delta'88, with tinted windows, and that Childs was the getaway driver. Rice said that he had known the Defendant for some 18 years, and that he met the rest of the individuals involved in the shooting through the Defendant. He has known Childs (O) for about five years, and Brown (Blizz) and Newsome (Hawk), the Defendant's cousins, for about four to five years. (N.T. Volume 3, 03/07/2014, pp. 19-20).

Detective Bamberski stated that those were Rice's words in the "exact way" he answered the questions. (N.T. Volume 3, 03/07/2014, p. 21).

Detective Bamberski further stated that Rice provided them with the real name of Hawk (Kenny James) and identified photographs of the Defendant (Ant) and William Childs (O). Further, Rice identified Blizz (Brown) and Hawk (Newsome) as the two males standing on the corner outside of the store on the video: "Blizz has a cast on his hand. He told me that he broke his hand fighting with somebody. Hawk is the one talking on the cell phone in the video." (N.T. Volume 3, 03/07/2014, p. 21).

Rice also stated that he had shown photographs of Blizz and Hawk to Detective Peterman from his Facebook page. Detective Bamberski confirmed that, despite Rice's assertions at trial that he did not know those individuals and did not have a Facebook page, those were indeed his words. Rice also confirmed that he talked to Blizz and Hawk after the shooting, and that both said that they were "just there." O never talked to Rice about it. (N.T. Volume 3, 03/07/2014, pp. 22-23).

21

Detective Bamberski noted that he gave Rice an opportunity to review his statement and that Rice reviewed it in his presence. Rice then signed each page and affixed the date and time (12:20pm) on the last page. Detective Bamberski testified that Rice signed a Statement of Adoption Attestation in his presence. (N.T. Volume 3, 03/07/2014, pp. 23-24, 29).

After Rice signed the statement, Detective Bamberski affixed his signature and badge number to the statement as well. Rice also identified photographs and signed them in Detective Bamberski's presence. He identified certain individuals on the photographs as O, Blizz/Darien [sic] Brown ("Broken hand in video."), Ant, and Hawk/Kenny James "On video on cell phone with hoodie."),[9] and affixed his signature. (N.T. Volume 3, 03/07/2014, pp. 25-29).

Detective Bamberski confirmed that the information provided by Rice was given to the assigned investigator and that other interviews were then conducted in connection with the case. (N.T. Volume 3, 03/07/2014, pp. 29, 35).

William Childs, O, testified that the Defendant was his friend. Childs stated that they were from the same neighborhood, and that he was probably older than the Defendant by a couple of years. He believed that they began socializing around 2007. They were "cool." Childs confirmed that he knew the Defendant's cousin, Blizz (Darian Brown), and that he also knew Hawk (Kenny James or James Newsome), and Rice (Twan). (N.T. Volume 3, 03/07/2014, pp. 41-45).

When asked about the shooting that occurred on November 29, 2009, he stated that he had heard of the victim, Cracks, but that he did not really know him. He confirmed that sometime before November 29, 2009, he had an occasion to be at a bar, Copabanana, at 40th and

---

[9] Rice was shown a video of two individuals standing in a corner, peering around the corner occasionally, at times looking down in the direction of the Wheels of Soul Club. (N.T. Volume 3, 03/07/2014, pp. 26-27).

22

Sansom Streets.[10] He saw the Defendant and Cracks at the bar. He confirmed that Cracks was at the bar, too. (N.T. Volume 3, 03/07/2014, pp. 47-48).

Childs testified that at let-out time, words were exchanged and shots were fired out on the street. When asked where the shots were coming from, Childs answered that the people who were with Cracks started firing at the Defendant. Childs stated that the Defendant did not tell him whether or not he was upset about the shooting. The Defendant was "a little angry, but not too upset" about it; there was no talk of retribution. (N.T. Volume 3, 03/07/2014, pp. 50-54).

Childs stated that he was familiar with the vicinity of 61st and Market Streets and that he knew about an after-hours club there, the Wheels of Soul, though he personally had never been there. Childs confirmed that he saw the Defendant early in the morning on November 29, 2009. Childs was at the house of his girlfriend's family member. Because he did not have a vehicle, he called the Defendant for a ride home, and the Defendant picked him up. Childs stated that he was at the 5500 block of Addison Street when he called the Defendant and that he intended to go to 61st and Race Streets. He did not remember what kind of car the Defendant had back then. (N.T. Volume 3, 03/07/2014, pp. 55-58).

After the Defendant picked him up, he first made a stop at a Chinese store at 61st and Market Streets. Childs stated that while he was sitting in the car, he heard about two gunshots. The Defendant appeared about 5-10 minutes afterwards. He was calm when he got into the car. He said, "Yo, you know, you hear them gunshots?" Childs drove the Defendant's car home. He stated that he got right into the driver's seat upon hearing gunshots because he was scared. He said he was going to pull off before the Defendant even got into the car. Childs noted that he did not see a firearm on the Defendant. (N.T. Volume 3, 03/07/2014, pp. 59-64).

---

[10] Witness Antoine Rice (Twan) stated that the Copabanana Bar is located at 40th and Spruce Streets, (N.T. Volume 1, 03/05/2014, p. 112; N.T. Volume 3, 03/07/2014, p. 16).

23

The Defendant did not say anything to Childs on the way back. After Childs found out that the victim had been shot dead, he did not discuss it with the Defendant. (N.T. Volume 3, 03/07/2014, pp. 64-68).

Childs stated that he remembered giving a statement to homicide investigators about the victim's death. He noted, however, that he "never reviewed anything that was said." When asked if he remembered what he told investigators when he gave a statement about Crack's death, he stated that it was "what I'm telling you now." (N.T. Volume 3, 03/07/2014, pp. 68-71).

Childs stated that he did not recall being at Southwest Detectives that early in the morning. However, he did recall being interviewed there because he was shot at when he was at a house at 57th and Addison Streets, on March 16th, 2010. Childs was there with his three-year old daughter; Rice was also with them. Upon hearing the shots, Childs ran into the house. No one was injured. (N.T. Volume 3, 03/07/2014, pp. 76-79).

Childs stated that he told the investigators at Southwest Detectives about that shooting. He confirmed that they typed down the statement and gave him a chance to review it. He also confirmed that the signature at the bottom of the typed statement was his. However, Childs stated that although he signed the statement, he did not recall reviewing it. N.T. Volume 3, 03/07/2014, p. 81).

Childs also remembered that he went down to the Homicide Division afterwards and talked to two detectives there at about 2:10 pm. Childs remembered being advised of his constitutional rights before questioning. (N.T. Volume 3, 03/07/2014, pp. 82-86).

He indicated that he was truthful to the investigators and that he was not under the influence of alcohol, drugs, or medications when he gave the statement. He also confirmed that

24

his biographical information on the statement was accurate. (N.T. Volume 3, 03/07/2014, pp. 87, 89).

Childs did not remember telling the Homicide investigators that on November 29, 2009 he was at 55th and Addison Streets, at his grandmother's place, and that he asked "this guy I know as Peanut" if he could get a ride home. He also confirmed that it would be fair to say that his memory was better in March 2010 than it was at the time of the Defendant's trial. (N.T. Volume 3, 03/07/2014, pp. 91-93).

Childs confirmed that Peanut's real name was Anthony Washington, and that he personally called the Defendant "Ant." He also confirmed that back then the Defendant lived in the 5600 block of Addison Street. (N.T. Volume 3, 03/07/2014, pp. 94-95).

Childs stated that he did not remember identifying the Defendant's photograph at Homicide, although he recognized the penmanship next to the photograph as his. Childs denied telling the detective that the Defendant called him about giving him a ride home. He stated that he told the detective that he himself called the Defendant and asked him for a ride. He agreed, however, that he may have had a memory lapse about it. (N.T. Volume 3, 03/07/2014, pp. 97-99).

Childs did not remember saying the following to the investigators:

[The Defendant] told me that he was outside and for me to come outside. I went outside and got into his car. He had a Green Delta. I got into the passenger's seat of the car. Peanut said that he had to go by the Wheels of Soul to check something out. That's when I said just go on and take me home. He told me that he was waiting on a call, that he had to see somebody. As we were driving, he got a call on his cell phone. It was this girl, Rima, that we know calling him. I heard her say, quote, 'that he's here,' end quote. Then Peanut answered her by saying, all right, I'll be right there. Then right after that he went to 62nd Street between Market and Ludlow Streets. He told me that he had to go see someone and that he would be right back. I told him that I was going to walk home because my house wasn't that far away from there. And Peanut said, 'No, cuz, I'm going to drop you off. Just wait.'

25

(N.T. Volume 3, 03/07/2014, pp. 100-101).

He also denied that the Defendant told him that Blizz and Hawk were up there. He stated that he did not remember telling the following to the investigators:

> Peanut got out of the car. He walked toward Market Street. I saw him turn down Market going towards 61st Street. That's where the Wheels of Soul is at. I was waiting there, like, a good half hour. I got into the driver's seat while I was waiting for him to come back. When Peanut got out of the car, he said to me that Blizz and Hawk were up there. They were meeting him there.

(N.T. Volume 3, 03/07/2014, p. 103).

Childs also stated that he did not recall informing the investigators about what happened while he was waiting for the Defendant in the car:

> That's when I heard the gunshots. It was, like, five, six shots that I heard. Then, like, five minutes later, Peanut came running around the corner from behind me, like, from Market Street, and he jumped into the passenger seat. And I asked him, 'What happened, what happened?' And he said, 'Just pull off, cuz. I'm about to drop you off at home. Just go ahead and pull off.' I asked him, 'What's going on?' He was shook up, nervous. He was looking around to see what was behind us like he was nervous. I know that.

(N.T. Volume 3, 03/07/2014, pp. 105-106).

He also noted that he did not remember telling the investigators that the Defendant was "real paranoid, scared" after he got into the car. He stated that he did not remember either seeing the gun on the Defendant, or telling the investigators that when the Defendant got into the car, he was holding a big black gun in his hand. He had no recollection of telling the investigators that the gun the Defendant was holding appeared to be a .45 caliber gun, an automatic, and that he put it into a pocket of a black hoodie that he was wearing. He indicated, however, that he did have a memory loss. "Certain things I just don't remember. Like, I have a shorter memory. I don't recall seeing no gun." (N.T. Volume 3, 03/07/2014, pp. 109-112).

Childs stated that he did not recall talking to the Defendant the following day; however, in his statement, he said:

26

I asked him, 'What happened?' He told me that, 'I got him out of here.' I said, 'You got who out of here?' He said, 'Crack, I got him out of here.' I asked him, 'Why didn't you let me know what was happening?' And he said, 'It was just you asked me to take you home. I wanted to take care of something and it was up your way.'

(N.T. Volume 3, 03/07/2014, p. 113).

Childs did not remember anyone ever telling him that the Defendant thought he was a "sell out," "a little soft." He also had no recollection of the Defendant asking him, "Why are you selling out?" (N.T. Volume 3, 03/07/2014, pp. 114, 118-19).

He confirmed that he said in his statement that Cracks was Omar Williams, "the one that got killed." However, while in the statement he indicated that the Defendant said to him that Cracks was "out of here" meaning that the Defendant had killed Cracks, Childs stated at trial that he did not remember giving that information to the investigators. (N.T. Volume 3, 03/07/2014, p. 115-16).

Childs also did not remember giving a statement about Blizz and Hawk; however, he agreed that he could have given such a statement. He acknowledged that "separate and apart from the statement," he did know Blizz and Hawk. Childs was not sure if, in fact, he gave the investigators their real names Darian (Blizz), and Kenny (Hawk). (N.T. Volume 3, 03/07/2014, pp. 119-20).

Childs confirmed that while he was at Homicide, detectives showed him a video. He noted that he did not recall stating to the investigators that he recognized Blizz and Hawk on the video:

Yes. I saw Blizz and Hawk. They were at the corner of Millick and Market Streets. I saw that Blizz had a wrap on his hand. I remember that Blizz did have a wrap on his hand back in late November, December, but I don't know ... why he had to wear the wrap. It was, like, from a doctor's office."

(N.T. Volume 3, 03/07/2014, p. 121).

27

He also stated that he did not remember saying to the investigators that he "can't really say if [he] saw [Blizz and Hawk] the day this happened." (N.T. Volume 3, 03/07/2014, pp. 122-23).

He first stated that he did not remember being shown photographs of Hawk and Blizz and identifying them both by their nicknames and real names. He stated that he also did not remember pointing out the photographs of the Defendant and the decedent and being asked to sign the photographs. However, moments later, Childs stated that he remembered identifying "Hawk, Kenny," and "Blizz, Darian" on the photographs, making notations on the photographs and signing them. He also identified the photographs of the victim and the Defendant. (N.T. Volume 3, 03/07/2014, pp. 124, 130-32).

Childs had no recollection of telling the investigators about Rima, the female who called the Defendant the night of the incident. He denied knowing a girl named Rima, or ever hearing about her. (N.T. Volume 3, 03/07/2014, pp. 125-26).

Childs did not recall reading over the five-page statement. He confirmed that the signature on each page was his; however, he stated that he was in such a rush to get out of there that he "could have signed [his] life away." (N.T. Volume 3, 03/07/2014, pp. 126-28).

Childs also stated that he did not remember reviewing the Statement of Adoption Attestation. He confirmed that the statement bore his signature and that he remembered signing the statement, but he indicated that he "just was signing stuff to ... get out of there and go home." (N.T. Volume 3, 03/07/2014, p. 129).

He acknowledged that the signature on the Non-consent to Videotape Interview was his, but stated that he did not remember being asked whether he wanted to go on videotape or not. (N.T. Volume 3, 03/07/2014, p. 130).

28

Childs stated that when he left Homicide that day, he returned to his neighborhood. He did not remember reaching out and calling Detective Peterman afterwards. (N.T. Volume 3, 03/07/2014, pp. 133-34).

He remembered being down at Homicide again and giving a statement to Detectives McDermott (first name not stated) and Serrano (first name not stated) but stated that he did not remember how long apart those visits were. [11] (N.T. Volume 3, 03/07/2014, pp. 135-36).

Childs stated that he did not remember being questioned that day as to whether he had any other information or giving this answer:

> The other day after leaving here I received a phone call on my cell phone from a private number. It was a male voice, and the guy said, 'I heard you were telling.' I responded, 'Who's this and what you talking about?' The voice then said, 'If it's true, I'm on your top.' I then hung up. I then called here ... and then Detective Peterman called me back and asked me to come in today.

(N.T. Volume 3, 03/07/2014, p. 138).

He stated that he did not remember receiving that phone call. When asked whether that telephone call affected his ability to remember, Childs said that he did not even recall what the caller had said to him and that he did not recognize the caller's voice. He did not receive other threatening calls afterwards. (N.T. Volume 3, 03/07/2014, p. 139-42).

On cross-examination, Childs confirmed that he had never seen the Defendant with a gun. He also stated that he signed some of the "stuff" because he "just wanted to get out of there. I didn't read nothing that was written down." Childs confirmed that the only thing he remembered with absolute certainty was that the Defendant was in the Chinese store when Cracks was shot. (N.T. Volume 3, 03/07/2014, pp. 144-45; 148; 150-51).

Detective George Fetters testified that he became involved in the investigation of the shooting death of Omar Williams which was assigned to Detective Howard Peterman. Detective

---

[11] Childs gave another statement at Homicide on March 23, 2010.

29

Fetters stated that he initially came in contact with William Childs, O, at the Homicide Division at 8th and Race. Prior to coming to the Homicide Division, Childs had given a statement at Southwest Detectives. (N.T. Volume 4, 3/11/2014, pp. 5-6).

Detective Fetters confirmed that he was aware that Childs came in contact with Southwest Detectives that day because there was a shooting incident in the area of 5600 Addison Street when Childs was present with his young daughter. Childs was then brought to Homicide as "the guy [they] want to talk to." (N.T. Volume 4, 3/11/2014, pp. 29, 34).

Detective Fetters indicated that he took a verbatim statement from Childs on March 17, 2010, regarding the victim's shooting death on November 29, 2009. Prior to taking the statement, he advised Childs of his constitutional rights. Childs did not appear to be under the influence of any drugs or alcohol when Detective Fetters talked to him. In addition to Detective Fetters, a fellow detective, Robert Fetters, was also present during the interview. (N.T. Volume 4, 3/11/2014, pp. 7-11).

Detective Fetters confirmed that Childs indicated in his statement that the day of the shooting, he was at his maternal grandmother's house at 55th and Addison Streets. Childs also stated that earlier, he asked the Defendant for a ride home; the Defendant promised to give him a call when he "[got] back around the way." Childs stated that the Defendant was from 5600 block of Addison Street. He identified the Defendant on the photograph. (N.T. Volume 4, 3/11/2014, pp. 11-12).

Detective Fetters noted that Childs stated that hours later - after 1:00 a.m. – the Defendant called him and told him that he was outside. Childs then left the house and got into the passenger seat of the Defendant's car, a green Delta. The Defendant told him that he had to drive by the Wheels of Soul club to check something out. Childs indicated to Detective Fetters

30

that he protested because he wanted to go straight home; he said that he would just walk home because it was not far away from where they were. The Defendant, however, insisted on making a stop to see someone he had to see. Childs testified that as they were driving, the Defendant received a phone call from a girl named Rima on his cell phone. Childs stated that he heard her say: "He's here." Immediately thereafter, the Defendant went to 62nd Street between Market and Ludlow Streets. The Defendant then got out of the car, and according to Childs, he went down Market Street toward 61st Street, where the Wheels of Soul is located. He asked Childs to wait for him and promised to be right back and then drop Childs off. (N.T. Volume 4, 3/11/2014, pp. 13-14). (N.T. Volume 4, 3/11/2014, pp. 13-14).

Detective Fetters indicated that Childs explained that the Defendant told him that Blizz and Hawk were up there waiting for him. Childs estimated that he was waiting for the Defendant "like, a good half hour." After that half hour had passed, he heard five to six gunshots. He got into the driver's seat while waiting for the Defendant to come back. Then, about five minutes later, the Defendant came running around the corner, from Market Street, he jumped into the passenger seat. He ignored Childs' question as to what had happened. Childs stated that the Defendant was nervous and looked "shook up." (N.T. Volume 4, 3/11/2014, p.14).

According to Childs, the Defendant said, "Just go." Childs then pulled up to the corner of Dewey Street, got off and walked down to his house. He did not hear from the Defendant until the next day. Childs stated that when the Defendant got into the car, he was holding a gun in his hand, a big black gun, an automatic, "like a .45 caliber or something." In the car, the Defendant put the gun into a pocket of a hoodie he was wearing. (N.T. Volume 4, 3/11/2014, p.15).

Detective Fetters testified that Childs also stated that on the following day he talked to the Defendant and asked him to explain exactly what had happened. Childs noted that the Defendant's response was that he "got him out of here" and that the Defendant, in fact, meant "Crack." Childs also indicated that, according to the Defendant, the reason the Defendant had not informed Childs of his true intentions earlier was simply that the business he needed "to take care of" was on the way to Childs' home anyway. Childs also stated that he heard from others later that the Defendant was referring to him as a "sell out." (N.T. Volume 4, 3/11/2014, p.16). (N.T. Volume 4, 3/11/2014, p.16).

Detective Fetters stated that Childs also noted that the real name of the victim was Omar Williams. Childs noted that he interpreted 'He's out of here' to mean that the Defendant killed Williams. He stated that he heard that the decedent was from Callowhill, 61st or 62nd Street, and that the Defendant never told him why he had killed him. "When we were talking about what happened, he, [the Defendant], said, 'Why, are you selling out on me, cuz?' I said to him, 'No, but you could have told me what was going on,' stuff like that." (N.T. Volume 4, 3/11/2014, pp.16-17).

Detective Fetters indicated that Childs explained that he knew who Blizz (Darian) and Hawk (Kenny) were and that they hung out with the Defendant down on his block, at 56th and Addison Streets. He stated that he knew them through the Defendant; he did not know their last names. (N.T. Volume 4, 3/11/2014, p.17).

Detective Fetters stated that Childs told him that he recognized Blizz and Hawk on the video. He stated that he saw them that day as they were standing at the corner of Millick and Market Streets. He stated that Blizz had a white wrap, "like an Ace bandage," on his hand in late November – December though Childs did not know why. Moments later, Childs said he could

32

not really say if he saw Blizz and Hawk that day. Detective Robert Fetters then showed him two photographs and Childs identified Blizz (Darian) on the first photo, and Hawk (Kenny) on the second photo, wrote the names he knew them by, then signed underneath and wrote the date, 3/17/10. He also identified and signed and dated the photographs of the victim, Omar Williams (Crack (sic)), and the Defendant (Peanut). (N.T. Volume 4, 3/11/2014, pp.18-19, 24-25).

Detective Fetters also stated that according to Childs, he did not know the full name of Rima, the female who, he said, called the Defendant the night of the incident although he knew where she lived and described how she looked. He also indicated that she "hangs with" the Defendant and that he thought that Hawk was seeing her. (N.T. Volume 4, 3/11/2014, pp.19-20).

Detective Fetters stated that after the statement was completed, Childs had an opportunity to review it and make any corrections if necessary. He did not make any corrections to the statement and signed each page in Detective Fetters' presence. (N.T. Volume 4, 3/11/2014, pp. 20-21).

Detective Fetters also stated that Childs reviewed the Statement of Adoption Attestation and adopted the verbatim statement, acknowledging by his signature "that the facts set forth in this statement are true and correct to the best of [his] knowledge, information, and belief." The Statement of Adoption Attestation was also signed by Detective Robert Fetters. (N.T. Volume 4, 3/11/2014, p. 22).

Detective Fetters also stated that he gave Childs an opportunity to go on video if he wanted but that Childs declined by signing a non-consent statement, which Detective Robert Fetters signed as a witness. (N.T. Volume 4, 3/11/2014, pp. 23-24).

Detective Fetters also stated that after Childs was interviewed, his statement was turned over to Detective Peterman. The District Attorney's Office was also apprised of the interview.

33

Childs' statement was not disseminated to public and was not "put on some website." (N.T. Volume 4, 3/11/2014, pp. 26, 31).

James Newsome (Hawk) testified that the Defendant was his blood cousin and that their mothers were sisters. He confirmed that in the early morning hours of Sunday, November 29, 2009, he was in the vicinity of the 6100 block of Market Street. (N.T. Volume 4, 3/11/2014, p. 42).

Newsome stated that he and his cousin Darian Brown (Blizz) were in Darby when he got a phone call from the Defendant. The mother of Brown's baby was also at the Darby apartment when the Defendant called. (N.T. Volume 4, 3/11/2014, pp. 42-45.)

Newsome confirmed that at that time, the Defendant was having a problem with an individual nicknamed Cracks. It was a "feud back and forth," a "[N]orth side/[S]outh side thing." The Defendant asked Newsome and Brown to meet him down on Market Street, to be his lookouts – to watch out for the police, and to make sure that he was safe. Newsome and Brown drove there together, in Brown's car. (N.T. Volume 4, 3/11/2014, pp. 46-49, 52).

Newsome stated that he grew up in West Philadelphia. He was familiar with the intersections around the area of 61st and 62nd Streets, and he knew an after-hours club, the Wheels of Soul, located in the area. Newsome and Brown met up with the Defendant on Dewey Street. The Defendant was there with his friend O. (N.T. Volume 4, 3/11/2014, pp. 50-52).

The Defendant told Newsome that he received a telephone tip that Cracks was at the Wheels of Soul. He was waiting for Cracks to come out. "We had to go post up and wait on the corner to see if any cops were coming...." (N.T. Volume 4, 3/11/2014, pp. 53-54).

Newsome stated that they initially stood on the corner of Dewey Street. Because there was too much traffic there, they went up to Arch Street and came back down toward 61st and

34

Market Streets. Eventually, they set up at Millick Street, near a Puerto Rican store, "watching for the cops." (N.T. Volume 4, 3/11/2014, p. 54).

At some point, Newsome got a phone call from the Defendant, who informed him that Cracks was wearing an orange or red shirt. The Defendant asked Newsome to call him if they spotted him first. After they spoke on the phone, Newsome and Brown went to the alleyway. From that vantage point, they could see Cracks' vehicle. (N.T. Volume 4, 3/11/2014, pp. 56-58).

They later got a phone call that Cracks was coming up the street. Eventually, they were able to see him. "And once he got in the car, that's when everything happens." When asked to explain what it means, Newsome explained that it means that "Cracks was murdered." (N.T. Volume 4, 3/11/2014, p.58).

Newsome stated that when the victim got into his car, the Defendant went out toward the car with a gun in his hand. The victim started the engine, and the Defendant then "shot at the car, shots were fired." Newsome noted that while he did not see how the Defendant was actually pointing the gun, he saw him "sprinting out towards the car" with a gun in his hand. The Defendant was shooting at the passenger side of the vehicle; Newsome heard about seven shots. The car crashed. Newsome ran though the alleyway down 61st Street toward Arch Street. The Defendant was running with him. (N.T. Volume 4, 3/11/2014, pp.59-62).

Newsome and Brown then returned to Upper Darby. The Defendant told them later that he killed him and that "he was happy he did it." (N.T. Volume 4, 3/11/2014, pp.62-66).

Newsome stated that he did not know the victim personally, though he went to school with his brother. When shown the video from that night, Newsome stated that he recognized himself and Brown. On the video, Newsome was talking on the phone with the Defendant. Newsome and Brown were looking down Market Street toward the after-hours place. Newsome

35

stated that he and Brown left the corner because they got a phone call from the Defendant instructing them to do so. Newsome then went to the alleyway. (N.T. Volume 4, 3/11/2014, pp. 66-68, 70-71).

At trial, Newsome recognized the statement that he gave to the Homicide investigators on December 24, 2013 when he was picked up and brought down to the Homicide Division. He was questioned about what information he had in regard to the victim's shooting. He confirmed that he gave a statement to Detective Peterman, who advised him of his constitutional rights and asked him what he knew about the incident. Newsome noted, though, that he was not entirely truthful the first time he met with the detective because he was protecting his cousin, the Defendant. (N.T. Volume 4, 3/11/2014, pp. 71-73, 90-91).

Newsome confirmed that he was truthful when he said:

Me and my cousin, Darian Brown, was at our apartment in Darby. ...My other cousin, Ant, Anthony Washington, called Darian .... He had some trouble with some guy in the Wheels of Soul who he had trouble with before. Me and Darian drove down to Dewey Street and met with Ant near Millick Street. Millick Street is where the Puerto Rican store with the camera is. That's where me and Darian set up. We was to look out for the boy Cracks and let Ant know when he was coming. Ant was set up in the alley about four houses up closer to 61st Street. We was between 60th and 61st. Ant had told us went we met up that he was setting up on Cracks' car near the alley. We was to look for the cops too and make sure he was cool.

(N.T. Volume 4, 3/11/2014, pp. 74-75).

He noted, however, that he actually lied when he said in his statement that he believed there was going to be a fistfight between the Defendant and Cracks. He did so because he did not want to put himself and the Defendant "in the situation." (N.T. Volume 4, 3/11/2014, p. 76).

At trial, Newsome admitted that he was aware that the Defendant was going to kill Cracks. He also admitted that he lied that the Defendant talked to Brown on the phone when he called them in Darby; in reality, he spoke with Newsome. Newsome said that he lied about it

36

earlier because he was trying to protect himself. Newsome also admitted that he lied when he stated that he only heard the shots being fired but did not see the actual shooting of Cracks. In fact, he did see the Defendant shoot Cracks. Newsome explained that he misled the detectives about it in his initial statement because he was trying not to "involve" himself and was also protecting his cousin. (N.T. Volume 4, 3/11/2014, pp. 76-78).

In addition, Newsome conceded that he stated, untruthfully, that he learned about Cracks' killing from the Defendant only during a winter cookout at his cousin Venus' house:

> [He] was there and he ... basically was glorifying what he did. He said he was in the alley waiting for the boy Cracks to get in his car, waiting until Cracks started the car. Ant ran up to the car and started shooting. He said the car pulled out and crashed across the street. He said he ran the same way he came out of.

(N.T. Volume 4, 3/11/2014, p. 78).

The Defendant noted that when he eventually gave a statement to Homicide investigators on March 4, 2014, just about one week before the trial, he told them that he actually witnessed the shooting firsthand. (N.T. Volume 4, 3/11/2014, pp. 79, 81).

Newsome also confirmed that there were two open cases pending against him at that time and that he was arrested just a couple of weeks before the Defendant's trial and was charged with weapons and marijuana possession. Newsome was also arrested December of 2013 and was charged with felony possession with the intent to distribute a controlled substance. (N.T. Volume 4, 3/11/2014, pp. 83-84, 102).

Newsome stated that through his attorney, he reached an agreement with the District Attorney that he would plead guilty to the charge of conspiracy to commit murder, with a maximum period of incarceration of 20 to 40 years for that crime. He stated that he understood that, as part of the agreement, he was obligated to testify truthfully at the Defendant's trial. (N.T. Volume 4, 3/11/2014, pp. 80, 85-89, 106).

37

Miles Powell testified that he lives in West Philadelphia and that he grew up in South Philadelphia. He stated that sometime in December of 2009, he purchased a handgun from "Rob," for five hundred dollars. (N.T. Volume 4, 3/11/2014, p. 111).

Powell testified that "Rob" called him and told him he had a firearm for sale. Rob informed him it was a ".40 Beretta," an automatic. After Powell agreed to purchase the gun, Rob instructed him to go to West Philly, off 57th Street, and meet him "on the little block." Powell pulled up, and Rob came to the passenger side window, showed him the gun, and asked him for the money. Powell then gave him the money, and Rob gave him the gun. Powell tried to negotiate but Rob said he would not go down on the price because the gun was not his. Powell testified that during the transaction, the Defendant was standing on the pavement and was watching them. Powell did not recall if anyone else was present, other than the Defendant. After purchasing the gun, he took it home. He could not recall the exact date of purchase. (N.T. Volume 4, 3/11/2014, pp. 111-120).

Powell was asked to take a look at the gun used as an exhibit in the courtroom. He recognized it as the gun he had purchased. (N.T. Volume 4, 3/11/2014, p. 119).

On January 11, 2010, Powell was stopped by the police. At that point he had the gun approximately for two-three weeks at the most, "not even a month." When he was stopped in South Philadelphia, he was in his cousin's car. The gun was in the trunk of the car, under a bunch of clothes. (N.T. Volume 4, 3/11/2014, pp. 120-21).

Eventually, Powell was arrested and served eight months. Detectives contacted him about the gun in the trunk of his car upon his release from prison. He was contacted in December, a little less than a year after his arrest. (N.T. Volume 4, 3/11/2014, p. 121).

38

They brought him down to Homicide on December 7, 2010 and questioned him about where exactly he got that gun. He was shown a photo array, and he identified the individuals who were present when the gun was being sold. (N.T. Volume 4, 3/11/2014, p. 122).

He remembered identifying the Defendant as "the boy that was standing on the pavement with Rob when [he] purchased the gun," and he confirmed that the signature on that photograph was his. He also confirmed that when he was brought to Homicide the following day, he identified the photograph of Rob as the person who had sold him the gun. He confirmed that the signature on that photograph was his, too. (N.T. Volume 4, 3/11/2014, p. 123-24, 126).

Powell said that he was on probation for the firearm violation. He also said that he had another open case, a felony drug case, and that his trial was scheduled for March 13, 2014. (N.T. Volume 4, 3/11/2014, pp. 127-28).

He confirmed that the Commonwealth would not do anything on his drug case or his open probation, but that if he were to be convicted and had to go before his sentencing judge or for a probation violation hearing, the District Attorney would notify the court of the extent of his cooperation in this case. Powell noted that he had no other agreement with the Commonwealth. (N.T. Volume 4, 3/11/2014, p.29).

On cross-examination, Powell stated that he purchased the gun at nighttime and that the transaction took about two minutes at the most. He also confirmed that he had never seen the Defendant before that day and that on the day of the transaction he saw him for about two minutes. He stated that the Defendant looked like the person who was standing on the pavement during the transaction, but he conceded that it was nighttime and that he could not be sure about it. He also confirmed that when he was arrested, the police showed him a photograph which the police circled. (N.T. Volume 4, 3/11/2014, pp. 130-33, 135-36).

39

Robert Cropper testified that the Defendant is the godfather of his daughter and that he and the Defendant had attended school together. He testified that he did not know Blizz and Hawk but that he knew Childs (O), with whom he had also attended school. He did not think that Childs and the Defendant were friends. (N.T. Volume 1, 03/12/2014, pp. 6-7).

Cropper testified that he was not involved in the sale of a firearm in December 2009, on the 5700 block of Addison. Cropper explained that around that time he was "going through it" with his wife, and that he was taking pills and drinking heavily. He also used to be a heavy drug addict. As a result, his memory was affected. Cropper explained, however, that his drug addiction did not affect his ability to remember where he ever lived. (N.T. Volume 1, 03/12/2014, pp. 6-11).

Cropper stated that he knew an individual nicknamed "Boo," Miles Powell. Powell lived across the street from him in South Philly. He also stated that he knew Cuz. However, he did not remember ever having a conversation with Cuz about selling a firearm or ever speaking or meeting with Powell about purchasing a gun. (N.T. Volume 1, 03/12/2014, pp. 8-9).

Cropper remembered having a conversation with homicide investigators at the Homicide Division about Boo and the sale of the gun. Cropper believed that Boo must have been locked up with a gun and lied about buying it from him. He stated that he did not remember that Boo ever called him to demand his money back. (N.T. Volume 1, 03/12/2014, pp. 11-12).

Cropper testified that when homicide detectives asked whether the Defendant had given him a gun to sell, he told them that he had not. He said that they threatened to send him to jail if he did not say that he got the gun from the Defendant to sell. (N.T. Volume 1, 03/12/2014, p. 13). He confirmed that they asked him if he knew anything about the sale of the Defendant's

40

gun, and that he denied it. He also confirmed that he gave a statement to the detectives. (N.T. Volume 1, 03/12/2014, pp. 13, 15).

He insisted that the Defendant did not give him the gun. He confirmed that he and the District Attorney met that morning and went over the statement which he had given earlier. Cropper stated that that statement refreshed his memory about something that had happened in the 5700 block of Addison Street. On that day, Boo met with Antoine Rice at that location. He denied that the Defendant was present when Boo met with Antoine. (N.T. Volume 1, 03/12/2014, pp. 16-17).

Cropper stated that he originally called Powell (Boo) to come up to the 5700 block of Addison Street to give him a ride home, and explained that they live across the street from each other in South Philadelphia. He maintained that the only reason he called Boo was to get a ride home. Cropper then introduced him to "Twan" (Rice) and the two started talking. In the meantime, Cropper himself was "across the street talking to somebody else or doing whatever else [he] was doing over." (N.T. Volume 1, 03/12/2014, pp. 18-20).

Cropper indicated that because he was not there, he was not in a position to provide other details about the Rice-Boo interaction:

A. I wasn't there. I just was there to get picked up. I was across the street.
Q. Did you get in the car?
A. No, I didn't even get in the car with him.
Q. If you called Boo from South Philly to come to pick you up and give you a ride, why didn't you get in the car?
A. Because I went somewhere else.
Q. Where did you go?
A. I think I went to my mom's house on 59th Street.

(N.T. Volume 1, 03/12/2014, pp. 20-21).

41

He explained that he ended up not getting into Boo's car because he started walking to his mom's at 59th Street. He said he was not sure who else was out there. (N.T. Volume 1, 03/12/2014, p. 21).

Cropper noted that when he spoke with the detectives, he did tell them the truth about what he knew. When shown a statement that he gave to the detectives on January 26, 2011, he confirmed that his personal information on the statement was correct. However, he stated that he did not recognize a copy of the statement that he gave to homicide investigators. He also stated that he was not sure that the statement, read to him earlier the same day by the District Attorney, contained true information. He said that it was long ago and he did not remember. (N.T. Volume 1, 03/12/2014, pp. 21-25).

He also stated that he did not remember the two detectives who interviewed him that day other than they were "two big black guys." He stated that he only "guessed" he remembered that the interview took place on January 26, 2011. However, he stated that the answers on the statement were not his because he "was always high and drinking around that time." He said that when the detectives interviewed him, he was probably intoxicated with either pills or alcohol. He confirmed that he remembered being high "all the time," and that when they interviewed him he may have been high. (N.T. Volume 1, 03/12/2014, pp. 25-26).

Cropper was "pretty sure" that he did not remember stating the following to the detectives:

> Around December of '09 I was standing outside of my parole office at 58th and Market Street when I ran into a guy named Cuz. Cuz asked me if I knew anybody with some burners. I told him, no, because I wasn't into that.

(N.T. Volume 1, 03/12/2014, p.27).

Under further questioning, however, he agreed that the answer sounded "about right."

42

He also stated that it sounded "about right" that Cuz gave him his cell phone number and asked him to call him if he heard anything. (N.T. Volume 1, 03/12/2014, pp. 29-31).

However, he denied stating to the detectives:

...I got a call from Twan telling me Ant was trying to shake some joints. Twan told me to call my folks ASAP. I then called Cuz in South Philly and told him that my people have a joint. Do you want to grab it? Cuz said all right and that he was on his way. I told him to meet me at 57th and Addison.

(N.T. Volume 1, 03/12/2014, p. 31).

He said, "I guess that's when the detectives was, like, you got to involve Anthony somehow or I'm going to jail, but he wasn't -- he didn't sell anything." (N.T. Volume 1, 03/12/2014, 2014, p. 31).

He did not "really remember" identifying Twan on a black-and-white photograph. He then said that he remembered identifying the picture, and he recognized the signature as his. However, he said that he did not know who wrote "Toine" above it, and he was not sure if the penmanship looked familiar. (N.T. Volume 1, 03/12/2014, pp. 33-34).

Cropper stated that the following answer was read correctly by the DA:

I just left Ant's house on the block when Boo drove up and parked in the middle of the 5700 block of Addison Street. When Boo drove up, Ant and a couple of other guys crossed the street to meet them, then Cuz and Boo got out of the car. I walked up and shook both their hands. I walked away and stayed on the other side of the corner of 56th and Addison Streets. Boo and Cuz started talking to Ant, then Twan walked over to a car and took something off the passenger side wheel well and put it in his waist.

(N.T. Volume 1, 03/12/2014, p. 34).

However, at trial he denied that the Defendant was out there and insisted they were talking to Twan. He also denied being asked this question, "Do you know what Twan took from the wheel of the car?" as well as giving this answer, "I don't' know, but I believe it was a gun." (N.T. Volume 1, 03/12/2014, p. 35).

43

Cropper stated that that day, Boo came down and was talking to Twan about something. "That was it. I never seen a transaction, never seen anything. I never seen anything pass from one person to the next. I don't know what was sold or if anything was sold or not." He stated that that day, no money passed hands. He also stated that the Defendant (whom he identified in court) was not there that day. (N.T. Volume 1, 03/12/2014, p. 36).

Cropper remembered being shown Boo's photograph, and he recognized his own signature underneath. He confirmed that the person shown in the photograph was someone he knew from South Philadelphia and that that same person showed up on Addison Street that day. (N.T. Volume 1, 03/12/2014, p. 37).

He also confirmed that he identified the Defendant on a photograph shown to him. While he recognized his own signature on the photograph, he said he did not know who wrote "Ant" above it. Cropper denied that the Defendant was out there. (N.T. Volume 1, 03/12/2014, p. 38).

Cropper also stated that he did not remember talking to Boo about the gun at a later time:

"Question: How do you know that Ant sold a gun?
"Answer: Because Boo called me later and said that the gun jammed on him and that he wanted his money back. I told Boo that I didn't have anything to do with that and to take that shit to where he got it from."

(N.T. Volume 1, 03/12/2014, p. 41).

He remembered the question about the type of vehicle Boo was driving when Boo and Cuz came up that particular day, but said that he did not remember giving the answer that Boo was driving a "white Crown Vic." (N.T. Volume 1, 03/12/2014, pp. 43-44).

He stated that he remembered signing the bottom of each page of the statement and that he recognized his signature. However, he indicated that he did not review his statement. When asked, why he did not review the statement, he said, "For what? You don't need to sign shit. You don't need to read it. ... You don't really read it. You just sign it." Cropper confirmed, however,

44

that when they were asking him questions, he tried to tell the detectives the truth. Cropper also did not remember being read the Statement of Adoption Attestation. He did, however, recognize his signature on the statement. (N.T. Volume 1, 03/12/2014, pp.44-47).

He stated that he was not currently under parole or probation, and that there were no open cases against him. (N.T. Volume 1, 03/12/2014, p. 48).[12]

Copper denied being concerned for his safety if he came in and testified. He agreed that he did not want to implicate someone who was the godfather of his child, a close friend. (N.T. Volume 1, 03/12/2014, pp. 47, 57).

Detective Levi Morton testified that on January 26, 2011, he interviewed Cropper in the Homicide Unit. Detective Morton stated that Detective William Holmes, now retired, was present during that interview. Detective Morton stated that Cropper did not appear to be under the influence of either drugs or alcohol during the interview.[13] (N.T. Volume 1, 03/12/2014, pp. 60-62).

Detective Morton confirmed that he and Detective Holmes took a verbatim statement from Cropper around 4:20 in the morning on January 26, 2011. Cropper did not appear tired and he was not handcuffed. (N.T. Volume 1, 03/12/2014, pp. 60-62).

Cropper stated that in December 2009, he was standing outside his parole office at 58th and Market Streets when he ran into a guy nicknamed Cuz. Cuz asked Cropper if he knew "anybody with some burners," meaning if anyone was selling guns. Cuz then gave him his

---

[12] Cropper confirmed that earlier, he pled guilty to a charge of aggravated assault and a weapons offense for which he received a sentence of four to eight years. He was sentenced on 5/22/2003, and eventually was paroled. His parole ended on 10/26/2011. He confirmed that in 2009, he would have been walking his parole off. (N.T. Volume 1, 03/12/2014, p. 50)

[13] Detective Morton was not the actual assigned investigator, but he worked as a team with the assigned investigator. (N.T. Volume 1, 03/12/2014, p. 62).

45

telephone number and asked him to give him a call if he heard anything. (N.T. Volume 1, 03/12/2014, pp. 65-66).

Cropper stated that thereafter he received a call from Twan (Rice), who told him that the Defendant was trying to "shake some joints" – meaning trying to sell some guns. Cropper identified Rice's photograph. (N.T. Volume 1, 03/12/2014, p. 66).

Cropper stated that he left the Defendant's house on the block "when Boo drove up and parked in the middle of the 5700 block of Addison Street." When he drove up, the Defendant and "a couple of other guys" crossed the street to meet him. Cuz and Boo got out of the car. Cropper then walked up and shook both their hands, upon which he walked away and stayed on the other side at the corner of 56th and Addison Streets. Boo and Cuz started talking to the Defendant. Then Twan (Rice) "walked over to a car and took something off the passenger side wheel well and put it in his waist." Detective Morton confirmed that these were Cropper's words, verbatim. (N.T. Volume 1, 03/12/2014, pp. 67-68).

Cropper testified that he understood that Twan took a gun from the wheel well. When Detective Morton showed Cropper a color photo of a black male, he recognized him as Boo (Miles Powell). Detective Morton then showed Cropper another color photo of a black male. Cropper identified the photo as that of the Defendant, "Ant," "my baby's godfather." (N.T. Volume 1, 03/12/2014, p. 68).

Cropper indicated that he did not see the Defendant sell the gun to Cuz because he (Cropper) walked away. He explained that he did not know what kind of gun the Defendant was selling but that he knew that the Defendant indeed sold a gun because Boo called him later: Boo said that the gun jammed on him and that he wanted his money back. Cropper stated that Boo was driving a "white Crown Vic." (N.T. Volume 1, 03/12/2014, p. 68-69).

46

Detective Morton confirmed that he gave Cropper an opportunity to read the statement. Upon reviewing the statement, Cropper signed each page. (N.T. Volume 1, 03/12/2014, p. 69-70).

Detective Morton also stated that Cropper signed a Statement of Adoption Attestation confirming that he adopted the verbatim statement to the best of his knowledge, information, and belief. He signed the statement in Detective Morton's presence, and also put the date and the time, 5:45 am, on the statement. (The statement was started at about 4:20 am.) Detective Morton stated that he also recognized Copper's signature on some photographs; he also stated that Cropper wrote "Toine" above Rice's photograph. Cropper also signed the Defendant's photograph and wrote "Ant" above, in his own handwriting. Cropper also signed Boo's photograph and put "Boo" above it. (N.T. Volume 1, 03/12/2014, pp. 70-73).

Detective Morton stated that neither he nor Detective Holmes threatened Cropper with a parole violation unless he told them that the Defendant was selling a gun. (N.T. Volume 1, 03/12/2014, p. 73).

Detective Morton also confirmed that he interviewed Miles Powell. Powell had testified the previous day that when Detective Morton showed him certain photographs, in particular the Defendant's photograph, Detective Morton actually told him which to identify and that Detective Morton circled the Defendant's photograph himself. Detective Morton denied that that was the case and indicated that Powell picked out the photograph himself. He stated that he showed Powell a photo array of eight color photographs, and that Powell recognized "the boy that was standing on the pavement with Rob when I purchased the gun," circled that photograph, signed and printed his name, and put the date and time. Detective Morton also stated that no threats were made to either Powell or Cropper. (N.T. Volume 1, 03/12/2014, pp. 73-77).

47

He also confirmed that Powell stated, in Detective Morton's presence, that he got the gun from a "light-skinned guy from Addison between 56th and 57th Street on Addison." Powell noted that Rob handled the transaction but that the gun belonged to "the light-skinned boy that he was with." (N.T. Volume 1, 03/12/2014, p. 74).

Detective Norma Serrano testified that William Childs was interviewed on March 23, 2010, at about 2:15 in the afternoon, at the Homicide Unit. She was present during the entire interview process when Childs was interviewed by Detective McDermott. She stated that Childs' statement was a word-for-word, verbatim statement.[14] (N.T. Volume 1, 03/12/2014, pp. 84-85).

In his statement, Childs stated, *inter alia*, that he identified a photo of James Newsome ("Hawk"), a friend. Childs said that on the night of the shooting, he was at the Wheels of Soul on Market Street. He also identified and signed Hawk's photograph. Childs noted that Hawk was the same individual who was on the video that was shown to him at his interview several days earlier. (N.T. Volume 1, 03/12/2014, pp. 86-89).

Childs testified that after he gave the earlier statement, he received a phone call on his cell phone from a private number. A male voice said, "I heard you were telling." The voice then said that "if it's true, I'm on your top." Childs then hung up and called Homicide. Detective Peterman called him back and asked him to come in. Childs stated that he did not recognize the voice. He also said that no one else made any threats to him in reference to this investigation. (N.T. Volume 1, 03/12/2014, pp. 87-88).

---

[14] Detective Serrano was not present during Childs' interview conducted six days earlier. (N.T., Volume 1, 03/12/2014, p. 83).

Detective Serrano noted that after giving the statement, Childs reviewed it before signing and dating it. She confirmed that she recognized Childs' signature. (N.T. Volume 1, 03/12/2014, pp. 89-90).

Darryl Lipscomb testified that he was the victim's father. He stated that he last saw his son alive on Thanksgiving in 2009, and that his son was healthy, and "in good shape" and "lively spirits" at that time. (N.T. Volume 1, 03/12/2014, p. 133).

Mr. Lipscomb stated that a couple of days after that Thanksgiving, his other son gave him a call at about 4 or 5 am, and told him that the victim had been shot. The victim's mother went to the Office of the Medical Examiner to identify the victim's remains. Mr. Lipscomb stated that at the time of his passing, the victim was 32 years old. (N.T. Volume 1, 03/12/2014, pp. 133-34).

The Defendant presented one witness, Detective Howard Peterman, who testified that as the lead detective, he is made aware of the "contents and generalities of the investigation." As a result of his investigation, Detective Peterman became aware of a Sonia Sumiel who was an eyewitness to this case. He stated that Sumiel was interviewed, and that her interview was memorialized and turned over to the Commonwealth for discovery purposes. (N.T. Volume 1, 03/12/2014, pp. 136-37).

## Expert Testimony

### Testimony of Dr. Edwin Lieberman, an Expert in Forensic Pathology

Dr. Edwin Lieberman testified as an expert in the field of forensic pathology. (N.T. Volume 2, 3/6/2014, p. 127).

49

Dr. Lieberman stated that he was involved in the post-mortem examination of the remains of the victim Omar Williams, who was pronounced dead inside a vehicle at 6000 Market Street, on November 29, 2009, at 5:09 in the morning, and that his remains were then transported to Dr. Lieberman's office and identified by his mother and girlfriend. The decedent's body was received with clothing, which included, *inter alia*, a bloody black shirt and a red pull-over style sweater, both with two gunshot defects. (N.T. Volume 2, 3/6/2014, pp. 129-31).

The decedent had a total of three gunshot wounds. There was no evidence of close-range fire. Neither the decedent's clothing nor the wounds on his body had any residue around them. (N.T. Volume 2, 3/6/2014, pp. 132-40, 142-43).

The gunshot wound labeled A was a gunshot wound to the top and back of the decedent's head. The gunshot went forward through the victim's skull into his brain. Gunshot wound B was a penetrating gunshot wound to the right side of the jaw. The gunshot went forward and upward into his brain. Gunshot wound C, a perforating gunshot wound, went through the victim's lung on each side as well as through his heart. The victim bled to death internally from that gunshot wound alone. Dr. Lieberman stated that each of the wounds, in and of itself, could cause death rapidly, and that all three were fatal. (N.T. Volume 2, 3/6/2014, pp. 132-40, 142-43).[15]

Dr. Lieberman stated that the projectile found at autopsy in the left frontal lobe of the victim's head was in pieces and that in its deformed state it was consistent with having passed through the skull. Dr. Lieberman also confirmed that prior to autopsy, he recovered from the body bag in which the body was transported to his office a projectile which could have caused the type of injuries observed on the victim. Dr. Lieberman confirmed that the series of

---

[15] Toxicological screening conducted on the remains of the victim showed that in his bloodstream he had Ecstasy and oxycodone. Nothing that was found in the toxicological screen contributed to the victim's death. (N.T. Volume 2, 3/6/2014, pp. 141-42).

50

projectiles were in substantially the same condition in the courtroom as they were when recovered by him at autopsy. (N.T. Volume 2, 3/6/2014, pp. 136-37, 140, 146-47).

Dr. Lieberman concluded that the injuries he observed were consistent with the shots being fired from the passenger's side of the car. Dr. Lieberman concluded within a reasonable degree of medical certainty that the victim died as a result of the gunshot wounds to his head and chest and that the manner of death was homicide. (N.T. Volume 2, 3/6/2014, pp.144-47).

**Testimony of Detective James Dunlap, Expert in Forensic Retrieval of Digital Imaging Video**

Detective James Dunlap testified that he is assigned to the Philadelphia Police Homicide Unit and that on November 29, 2009, he was involved in the investigation of the shooting death of Omar Williams. He stated that he does not handle live investigations, but that he handles the technical aspects, mainly video, as a member of Digital Imaging Video Response Team ("DIVRT"), a cooperative effort between the FBI and Philadelphia Police Department. (N.T. Volume 4, 3/11/2014, pp. 145- 146).

Detective Dunlap stated that he had been trained by the Audio/Digital Forensic Unit of the FBI and by the Law Enforcement Video Association. He stated that in the last five years, he had recovered video from digital recorders of over 500 crime scenes. He was also one of the instructors for the DIVRT program and helped teach other detectives the basics for recovering video from digital recorders. Detective Dunlap testified that he has been qualified as an expert in both state and federal courts and that he is certified as a forensic video technician. He stated that he is trained to go out to crime scenes, secure video, and present it in court. (N.T. Volume 4, 3/11/2014, pp. 146-48).

51

This Court ruled that Detective Dunlap qualified as an expert in the field of forensic retrieval of digital imaging. (N.T. Volume 4, 3/11/2014, p. 148).

Detective Dunlap testified that, as part of the investigation of the shooting death of the decedent, he was directed to go to three locations in the vicinity of 61st and Market Streets to recover video.[16] He recovered the video the day after the shooting. Detective Dunlap did a time check on all of the retrieved video using the U.S. Naval Observatory Master Clock, an atomic clock with a very high degree of accuracy. (N.T. Volume 4, 3/11/2014, p. 149-50).

He started by going to JR's Tattoo and Body Piercing, which had a very basic digital video recorder. Detective Dunlap established that that video machine was 49 minutes fast, so he made the relevant adjustment, and offloaded one-hour blocks surrounding the time frame of the incident for the two exterior cameras. After going through that entire video, he identified only about two minutes worth presenting at trial. The clip showed a view from the camera on the exterior wall facing eastbound on Market Street. The video showed three males exiting the front door to the Wheels of Soul and walking through that camera view. In fact, one of them – the male in the front in red - was identified as the decedent in the case. (N.T. Volume 4, 3/11/2014, pp. 150-52).

Detective Dunlap explained that the individuals on the video were walking into the adjacent camera, which went westbound on Market Street. The video showed how they were crossing the intersection of 61st and Market Streets. The video then showed a car pull up toward the red light. Another car pulled out of a parking spot, and "travel[ed] across Market crossing

---

[16] The first location was JR's Tattoo and Body Piercing at 6110 Market Street. The second location was Market Grocery with an address of 6033 Market Street, and the third location was Jess and Ron's place located at 6054 Market Street. Detective Dunlap stated that there was "an hour [of video] from JR's Tattoo Parlor, two hours from Jess and Ron's Place, and three hours from Market Grocery," spanning a timeframe beginning before the incident happened until a few minutes after its conclusion. (N.T. Volume 4, 3/11/2014, p.149, 171).

52

the curb and actually striking light." Detective Dunlap pointed to a figure on the video running over to the car. Immediately afterwards, the car continued on and struck the wall across the street. (N.T. Volume 4, 3/11/2014, pp. 152-53).

Detective Dunlap summarized his observations as follows:

The biggest thing that you can take from this is it took one minute and 50 seconds from the time the males exit the Wheels of Soul until you see the car crashing into the wall across the street....

(N.T. Volume 4, 3/11/2014, p. 154).

Next, Detective Dunlap walked the jury through the video pulled from Jess and Ron's Bar. On that video, it was possible to see the decedent's car striking the wall of the bar and bouncing off. Detective Dunlap stated that the impact occurred at approximately 5:01am. (N.T. Volume 4, 3/11/2014, pp. 154-55).

The last place from which he pulled video was the Market Grocery located at the northwest corner of Market and Millick Streets.[17] Detective Dunlap stated that he pulled about three hours of video from that location. (N.T. Volume 4, 3/11/2014, p. 155).

Upon going through the video, Detective Dunlap cut out one or two clips that he found relevant. The clip on the video ran from 5:05 to 5:07:55 a.m. The video was one hour and eight minutes fast;[18] the real time on the video was actually 3:57 am to 4:00 am, an hour and a minute before the shooting. On the video, there were two males walking on Market Street toward Millick Street. One male had some type of bandage on his hand. They walked through the camera and continued down Millick Street into the next camera view, headed back up to Market

---

[17] Market Grocery had a camera which covered the front of the business along with some of the sidewalk along Market Street, and a camera at the back of the property which covered the sidewalk and street along the Millick Street side. (N.T. Volume 4, 3/11/2014, p. 155).

[18] It was just 8 minutes off, but by accounting for daylight saving time, it was one hour and eight minutes off. (N.T. Volume 4, 3/11/2014, pp. 157-58).

Street and went back westbound on Market Street in the direction of 61st Street where they walked out of the camera view (N.T. Volume 4, 3/11/2014, pp. 157-58).

The next clip showed events which occurred approximately one hour later. This time, the two males were coming up from Millick Street. The time on that clip roughly was 5:59:45 seconds, and the video played to 6:01:55 seconds. (In real time, that was roughly 4:51:45 seconds through 4:53:55 seconds.) The clip showed those males up until seven minutes before the actual incident. They were shown on the corner, and the direction they were facing was that of 61st Street toward the Wheels of Soul. Detective Dunlap stated that the decedent's car was actually parked just off the corner of Market Street. The men on the video were leaving the corner and heading northbound on Millick Street toward Arch Street. They went out of sight approximately seven minutes before the actual incident. (N.T. Volume 4, 3/11/2014, pp. 159-60).

The next clip showed the same location right at the time frame of the incident. The clip showed the two individuals who were with the victim earlier walking into the camera view coming off Market Street. The men headed down Millick Street off Market Street, and a car's headlights were turned on (as though from a remote control device). The two men headed toward the car; then one of the males was seen running back toward Market Street, and the second male was seen returned running back to the car. The end of the clip showed the car drive off. Detective Dunlap then showed another video for the same time frame, from the front camera. The video showed the two males again walking off Market Street onto Millick Street. It was roughly 5:00 a.m., going on 5:01. (N.T. Volume 4, 3/11/2014, pp. 160-62).

Detective Dunlap played the clip again, showing that left-hand corner, and zooming in as much as possible without losing clarity. He pulled a still from that exact moment in time. On

54

the still of a sidewalk going eastbound, there was a cutout (a vacant lot where a building had been). That view depicted what appeared to be legs cutting across the pavement toward Market Street and across a dark patch. (N.T. Volume 4, 3/11/2014, pp. 163-64).

Detective Dunlap stated that after seeing that video, he went on location, parked the car, walked to the back alley behind the grocery store and ascertained that the alleyway goes straight through. "You can get in there. You can go into either one of those cutouts where the properties were and ... it's a "T" alley. You can take it all the way up to Arch Street, and it was not gated. It was unobstructed." Detective Dunlap confirmed that one could access that cutaway through the alleyway right behind that grocery store - that there was open access. "You [could] walk straight through, straight out." (N.T. Volume 4, 3/11/2014, pp. 164-71).

Detective Dunlap noted that in the months following the shooting, he went on location to take photographs and to familiarize himself with some of the openings:

> I walked through. There is an alley in the back that cuts through and "Ts," goes down to Arch. Directly next to the property there is ... a vacant lot where a property used to be that's been knocked down. There is two properties and then there is another vacant lot right there, which both connect to this alley in the back.

(N.T. Volume 4, 3/11/2014, p. 156).

Detective Dunlap stated that the alley was right in the rear of the Market Grocery and that it ran from Millick Street to 61st Street. (N.T. Volume 4, 3/11/2014, p. 156).

### Testimony of Police Officer Kelly Walker, an Expert in Ballistics and Firearm Identification

Police Officer Kelly Walker testified as an expert in ballistics and firearm identification. Officer Walker confirmed that she had items submitted to her for microscopic examination in regard to the shooting death of Omar Williams. Officer Walker stated that the reports submitted

in this case were prepared by Officer Krimsky (first name not stated), and that she was his co-examiner. (N.T. Volume 1, 03/12/2014, pp. 94-95).

Officer Walker had a chance to identify microscopically the five fired cartridge casings (FCCs) that were submitted by CSI Whitehouse on Property Receipt No. 9010311. They were .40-caliber S & W, and their stated source was 6000 block of Market Street. Officer Walker confirmed that based on her observations and the repetitive marks she was able to see under the comparison microscope, her expert opinion was that all five of those .40-caliber FCCs were fired from the same .40-caliber semiautomatic handgun. (N.T. Volume 1, 03/12/2014, pp. 105, 107).

Officer Walker also stated that another projectile was eventually removed from the decedent's vehicle at the police garage ( Property Receipt No. 9010320). Officer Walker noted that despite the bullet's being deformed, she was able to make certain microscopic observations and establish that the damage to that bullet was consistent with its having hit a hard object such as a vehicle. (N.T. Volume 1, 03/12/2014, p. 106).

She also confirmed that she had occasion to examine certain bullets that were recovered from the victim, including,

> on Property Receipt 3127583 submitted by Howard Peterman ... bullet B-2, which was a .40 S & W/.10 mm copper alloy bullet specimen, [its] nose area was flattened, there were foreign markings, there was a blood-like substance attached....

(N.T. Volume 1, 03/12/2014, p. 108).

The District Attorney explained that, as per Dr. Lieberman's expert testimony, the stated source of the projectile was the body bag in which Mr. Williams' body was transported. (N.T. Volume 1, 03/12/2014, p. 108).

56

Officer Walker confirmed that there were altogether three bullets submitted from the Medical Examiner's Office, and that a fragment of one of the bullets had broken off.[19] (N.T. Volume 1, 03/12/2014, p. 110).

Officer Walker was able to examine those bullets microscopically. Based on her examination, she was able to conclude that the bullets from the bodybag and the two recovered from the victim's head were fired from the same firearm. (N.T. Volume 1, 03/12/2014, pp. 111-12).

Officer Walker stated that as a result of an Integrated Ballistics Identification System (IBIS) hit that showed a possible match between the gun that was recovered and the casings and bullets, it was recommended that a further examination on that gun be conducted.[20] Officer Walker stated that she did not examine the gun personally, but that Officer Bottomer (first name not stated) and Officer Stott (first name not stated) did. At a later point, when Officer Walker examined the test shots fired from the .40-caliber firearm submitted to the Firearms Identification Unit for examination in this case, she concluded that the five casings from the scene were fired from that firearm. She also concluded that the projectiles recovered from the victim's vehicle, his body bag and his right frontal lobe were all fired from that firearm. Officer Walker confirmed that these findings were memorialized in the reports submitted in this case. (N.T. Volume 1, 03/12/2014, pp. 115-16, 119).

Officer Walker stated that all of the opinions she offered to the jury were to a reasonable degree of scientific certainty. (N.T. Volume 1, 03/12/2014, pp. 121).

---

[19] In his expert testimony, Dr. Lieberman had testified earlier that it was from the right frontal lobe of the victim's brain.
[20] Officer Walker stated that the IBIS is a computer system that gives possible ballistics matches. If the IBIS technician sees something that looks really close, further investigation would be warranted. (N.T. Volume 1, 03/12/2014, p. 113).

57

## Stipulation

It was stipulated by and between counsel that an inventory search of the white Crown Victoria in which Miles Powell was an occupant on January 15, 2010, which search was conducted pursuant to a search warrant, resulted in recovery of a semi-automatic .40-caliber handgun which was located inside the trunk area of the car. The item was placed on Property Receipt No. 2888844. The firearm was then submitted to the Firearms Identification Unit for microscopic examination. (N.T. Volume 1, 03/12/2014, p. 120).

## Self-Authenticating Document

The Commonwealth also presented a self-authenticating document indicating that a record check was made of the Defendant, and that it was revealed that the Defendant did not have a valid license to carry firearms. The record check was conducted by the Pennsylvania State Police, and the self-authenticating document was signed on April 18, 2011 by the Commissioner of the Pennsylvania State Police Custodian of Records, and the Director of Firearms Division of the Pennsylvania State Police. Both individuals signed this document under the Pennsylvania State Seal. (N.T. Volume 1, 03/12/2014, pp. 130-32).

## SUFFICIENCY OF THE EVIDENCE

The Defendant contends that there is insufficient evidence to establish beyond reasonable doubt his guilt of each of the crimes for which he stands convicted. He claims that the Commonwealth did not prove that he was the perpetrator of the crimes, or a criminal conspirator, or an accomplice. The Defendant further argues that the Commonwealth did not prove specific

58

intent to kill, malice, or premeditation. He insists, therefore, that he is entitled to an arrest of judgment.

Upon review of the record, this court finds the Defendant's claims meritless. There was sufficient evidence to convince the jury beyond reasonable doubt that the Defendant was guilty of the crimes for which he stands convicted.

In passing upon a motion in arrest of judgment, the sufficiency of the evidence must be evaluated upon the entire trial record; all evidence must be read in the light most favorable to the Commonwealth, which is entitled to all reasonable inferences arising therefrom; the effect of such a motion is to admit all facts which the Commonwealth's evidence tends to prove. *Commonwealth v. Johnson*, 428 Pa. Super. 494; 631 A.2d 639 (1993)(*citing Commonwealth v. Blevins*, 453 Pa. 481, 483, 309 A.2d 421, 422 (1973)).

The standard for reviewing whether the conviction was based on sufficient evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond reasonable doubt. *Commonwealth v. Lewis*, 2006 PA Super 314, 911 A.2d 558, 563-64 (Pa. Super. Ct. 2006). When reviewing the evidence adduced at trial, the court may not weigh the evidence and substitute its judgment for that of the fact-finder. *Commonwealth v. Derr*, 841 A.2d 558, 560 (Pa. Super. 2004). While guilt may never rest upon conjecture or surmise, a conviction may stand on circumstantial evidence. *Commonwealth v. Roscioli*, 454 Pa. 59, 62, 309 A.2d 396, 398 (1973).

**First-degree Murder**

The crime of murder of the first degree is defined as a criminal homicide when it is committed with malice by an intentional killing. 18 Pa.C.S. § 2502(a). The killing is intentional when it is willful, deliberate and premeditated. § 2502(d). To support a conviction for first-degree murder, the Commonwealth must prove that the victim is deceased; that the Defendant killed him; and that the Defendant acted with the specific intent to kill. *See Commonwealth v. Montalvo*, 604 Pa. 386, 986 A.2d 84, 92 (2009); *Commonwealth v. Pagan*, 597 Pa. 69, 950 A.2d 270, 278-79 (2008); *Commonwealth v. Koehler*, 558 Pa. 334, 737 A.2d 225, 233–34 (1999). The *mens rea* required is the specific intent to kill; it is the factor that distinguishes first-degree murder from murder of a lesser grade. *Commonwealth v. Taylor*, 583 Pa. 170, 186, 876 A.2d 916, 926 (2005); *Commonwealth v. Moore*, 473 Pa. 169, 174, 373 A.2d 1101, 1104 (1977). The jury may infer that the use of a deadly weapon on a vital part of the human body is sufficient to establish the specific intent to kill. *Commonwealth v. May*, 584 Pa. 640, 647, 887 A.2d 750, 753 (2005); *Commonwealth v. Rivera*, 565 Pa. 289, 773 A.2d 131, 135 (2001); *Commonwealth v. Commander*, 436 Pa. 532, 538-39, 260 A.2d 773, 777 (1970). The Commonwealth also has the ability to prove the Defendant's intent through circumstantial evidence. *Rivera, supra,* at 135.

Here, the decedent's cause of death was ruled homicide. The evidence demonstrated that the Defendant planned to kill the victim following an altercation at a bar a few days earlier. In that altercation people with the victim were shooting at the Defendant. The killing of Omar Williams was premeditated as evidenced by the Defendant's purposely finding out the location of the victim; arriving at that location armed with a .40-caliber Beretta; recruiting his cousins as lookouts; using his friend as a getaway driver; and waiting in an alleyway for the victim to come out of the local after-hours club, the Wheels of Soul, get into his car and start the engine. The Defendant then walked up to that car and fired his .40-caliber gun at vital parts of the victim's

60

body – his head and chest area. As established by expert testimony, any of the shots fired at the victim would have killed him. The Defendant sold the gun soon afterwards to a "boy in South Philly," and the ballistic evidence linked the gun recovered from the trunk of the buyer's car (Powell's car) to the fired cartridge casings and bullets. Furthermore, the Defendant told multiple individuals about murdering the decedent and bragged about it.

The killing of the decedent was willful, deliberate and premeditated. This court concludes that the record at trial was more than sufficient for the jury to conclude, beyond reasonable doubt, that the Defendant was guilty of murder of the first degree.


## Conspiracy to Commit First-Degree Murder


The Defendant alleges that the evidence was insufficient to support the guilty verdict on the charge of conspiracy to commit first-degree murder. The Defendant's argument is meritless and must fail.

Under the law, a conspiracy is an agreement between two or more persons to commit a crime. A conspiracy exists once two conditions have been met: (1) there must be an agreement (verbal or unspoken) and (2) one of the members must then commit an overt act in furtherance of the conspiracy. 18 Pa.C.S. § 903. In order to prove conspiracy, the jury must find that: 1) the defendant intended to commit or aid in the commission of the criminal act; 2) the defendant entered into an agreement with another to engage in the crime; and 3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. *Montalvo*, 956 A.2d at 932 (citation omitted).

61

The Commonwealth may prove conspiracy by direct evidence or by circumstantial evidence, including the relationship, conduct, or circumstances of the parties or overt acts on the part of co-conspirators. *Commonwealth v. Spotz*, 552 Pa. 499, 716 A.2d 580, 592 (1998); *see also Commonwealth v. Murphy*, 577 Pa. 275, 844 A.2d 1228, 1238 (2004) (quoting *Spotz*). In the case of a conspiracy to commit first-degree murder, each member of the conspiracy can be convicted of first-degree murder regardless of who inflicted the fatal wound. *Montalvo, supra* at 932.

Here, the Defendant conspired with any or all of these individuals, Darian Brown (Blizz), James Newsome (Hawk), and William Childs (O), to engage in conduct for the planning and commission of the crime of the decedent's murder. The overt act of the conspiracy to commit first-degree murder consisted of keeping the victim's vehicle under watch, placing lookouts (Brown and Newsome) for police or other persons who may be nearby, and firing multiple shots at the victim.

The evidence established, beyond reasonable doubt, that the Defendant was guilty of conspiracy to commit first-degree murder.

## Possessing an Instrument of Crime

The Defendant further contends that the evidence was insufficient to support the guilty verdict on the charge of possessing an instrument of crime. The Defendant's argument is without merit.

Under the law, a person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally. 18 Pa.C.S. § 907(a). An instrument of crime includes any item the actor used for criminal purposes and had in his possession under

62

circumstances not manifestly appropriate for any lawful uses the item may have. *Id.* To convict of this offense, the Commonwealth must prove that the Defendant "possessed [the] gun under circumstances manifestly inappropriate for such lawful uses the gun may have had and with an intent to employ it criminally." *Commonwealth v. Jeter*, 275 Pa. Super. 89, 94, 418 A.2d 625, 628 (1980).

Here, there was sufficient evidence for the jury to find beyond reasonable doubt that the Defendant possessed an instrument of crime. Armed with a gun which he intended to use criminally, the Defendant arrived at the location where he expected the decedent to be. The Defendant then fired multiple shots at the decedent.

The ballistics analysis conclusively linked the gun to the fired cartridge casings collected on the scene, the bullet removed from the doorframe of the decedent's car, and the ballistic evidence submitted by the Medical Examiner's Office. Although the Defendant disposed of the gun by selling it following the decedent's murder, the gun was eventually recovered. The attorneys stipulated to the circumstances under which the police recovered the .40-caliber Beretta found in the trunk of the white Crown Victoria in which Miles Powell (the person who purchased the Defendant's gun and who gave a statement that the Defendant was present during the transaction) was an occupant on January 15, 2010, at the 1500 block of South 31st Street. Furthermore, the record check conducted by Pennsylvania State Police established that the Defendant did not have a valid license to carry firearms.

This court is firmly of the belief that, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth as verdict winner, there is sufficient evidence to enable the jury to find every element of possessing an instrument of crime beyond reasonable doubt.

63

## WEIGHT OF THE EVIDENCE

The Defendant's claim that the verdict was against the weight of the evidence and was based on speculation, conjecture, and surmise must also fail. The weight given to the evidence is wholly the province of the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. *Commonwealth v. Hunzer*, 868 A.2d 498, 506-507 (Pa. Super. 2005). Any motion for a new trial grounded in the contention that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to sustain the verdict. *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191-1192 (Pa. Super. 2004), *appeal denied*, 583 Pa. 689, 878 A.2d 864 (2005). Accordingly, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. *Id.* Questions concerning inconsistent testimony go to the credibility of witnesses. *Commonwealth v. DeJesus*, 580 Pa. 303, 311, 860 A.2d 102, 107 (2004). The court cannot substitute its judgment for that of the jury on issues of credibility. *Id.* The decision whether to grant a new trial on this basis rests within the discretion of the trial court. *Commonwealth v. Hunter*, 381 Pa. Super. 606, 617, 554 A.2d 550, 555 (1989). A trial court should award a new trial on the ground that the verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice, thereby making the award of a new trial imperative so that what is right and just may be given another opportunity to prevail. *Commonwealth v. Wall*, 2008 PA Super 151, 953 A.2d 581, 586 (Pa. Super. Ct. 2008); *Commonwealth v. Whitney*, 511 Pa. 232, 239, 512 A.2d 1152, 1155-1156 (1986). "A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Widmer*, 560 Pa. 308, 320, 744 A.2d 745, 752 (2000).

64

This court finds that the Commonwealth presented sufficient evidence to uphold the Defendant's convictions. The convictions in the present case were not against the greater weight of the evidence.[21]

Under the law, evidence relating to the contents of any prior inconsistent statement may be regarded as proof of the truth of anything each of these witnesses said in any earlier statement. Pa.R.E. 613. For a prior inconsistent statement to be admitted as substantive evidence, its declarant must be available for cross-examination. Pa.R.E. 803.1.

> [A] prior inconsistent statement may be offered not only to impeach a witness, but also as substantive evidence if it meets additional requirements of reliability. ... The test is a two-part inquiry: 1) whether the statement is given under reliable circumstances; and 2) whether the declarant is available for cross-examination.

*Commonwealth v. Carmody*, 2002 PA Super 151, 799 A.2d 143, 148 (2002).

This court explained that the jury may regard evidence relating to the contents of any prior inconsistent statement as proof of the truth of anything each of these witnesses said in any earlier statement, as well as consider this evidence to help the jury assess the credibility and weight of the testimony of each of these witnesses at trial. Although multiple witnesses in the present case did not remember their earlier statements against the Defendant and made various excuses for their memory lapses (for example, using opiates for years (Rice); being shot in the face twice (Childs); engaging in excessive drinking and fighting with his wife (Cropper)), all of those witnesses made prior statements to police. Those statements were damaging to the Defendant, and the jury was free to believe them.

This court also instructed the jury regarding accomplice liability and accomplice testimony. A person is an accomplice of another if he intends to promote or facilitate the commission of the offense and his complicity is established by law. 18 Pa.C.S. § 306(c). Such

---

[21] Defendant's reliance on *Commonwealth v. Karkaria* 533 Pa. 412, 625 A.2d 1167 (1993) is misplaced for the reasons set forth in footnote 1. In this case, the verdict was consistent with the evidence.

65

person solicits another person to commit an offense, or aids or agrees or endeavors to assist such other person in planning or committing the offense. *Id.*

This court warned the jury that when a Commonwealth witness is an accomplice, his testimony must be assessed by special precautionary rules. Where an accomplice implicates the defendant, it is the trial court's obligation to tell the jury that the accomplice is a corrupt and polluted source and that his testimony should be viewed with great caution. *Commonwealth v. Rega*, 593 Pa. 659, 689, 933 A.2d 997, 1014 (2007); *Commonwealth v. Chmiel*, 536 Pa. 244, 251, 639 A.2d 9, 13 (1994). This court explained that an accomplice may falsely try to place the blame on someone else in hopes of obtaining favorable treatment but that, on the other hand, an accomplice may be a perfectly truthful witness.

In the present case, witnesses Darian Brown (Blizz), William Childs (O), and James Newsome (Hawk) had criminal involvement in the death of Omar Williams, and as such, they were accomplices in the crime. Although accomplice testimony was supported by copious independent evidence in the present case, even in the absence of such evidence the jury could still have found the Defendant guilty solely on the basis of accomplice testimony if the jury was satisfied beyond reasonable doubt that the accomplice had testified truthfully and that the Defendant was guilty.

Here, the evidence presented at trial viewed in the light most favorable to the Commonwealth as verdict winner established that the Defendant had committed the crime of murder of the first degree. The malice could have been inferred, *inter alia*, from the Defendant's use of a deadly weapon on vital parts of the decedent's body – his head and chest. The evidence also demonstrated that the Defendant engaged in extensive planning for the decedent's murder and employed other people to act. This court has noted that "this could have almost been like an

66

organized crime case" complete with lookouts and a getaway driver. N.T. Volume 1, 03/13/2014, p. 135. The Defendant then took a substantial step in furtherance of the conspiracy by firing shots at the decedent thereby murdering him. In addition, the evidence demonstrated that the Defendant was in possession of an instrument of crime and that he intended to employ it criminally.

Upon review of the challenge to the weight of the evidence, this court concludes that the verdict was consistent with the evidence. The jury was free to believe all, part or none of the evidence, and it clearly found the evidence to be credible and reliable.

We conclude, therefore, that the jury verdict did not shock any sense of justice. No relief is due.

## CONCLUSION

In summary, this court has carefully reviewed the entire record and finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Defendant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

BY THE COURT:

STEVEN R. GEROFF, J.

67